UNITED STATES of America and O. Gordon Delk, Acting Commissioner of Internal Revenue, Appellees,

v.

Richard GOODMAN, also known as Dick Goodman, Appellant.

No. 8135.

United States Court of Appeals Fourth Circuit.

Argued Oct. 12, 1960.

Decided March 30, 1961.

Sobeloff, Chief Judge, dissented.

Kenneth Carroad, New York City (Harry Spilka, Norfolk, Va., Theodore Propp, New York City, and Edwin L. Wolf, Garden City, N. Y., on the brief), for appellant.

Norman H. Wolfe, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks and Burt J. Abrams, Attys., Dept. of Justice, Washington, D. C., and Joseph S. Bambacus, U. S. Atty., Richmond, Va., on the brief), for appellees.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and STANLEY, District Judge.

BOREMAN, Circuit Judge.

Having been ordered by the United States District Court for the Eastern District of Virginia to answer certain questions propounded to him in a Tax Court proceeding, Richard Goodman prosecutes this appeal, asserting that the court erred in denying his claim of privilege under the Fifth Amendment to the Constitution of the United States.

For several years before 1950, Goodman was employed by Associated Barr Stores, Inc., the latter being hereinafter referred to as "Associated," which owned and operated a chain of retail jewelry stores with a principal office in Philadelphia. Goodman was manager of Associated's Norfolk, Virginia, store. In 1949 and 1950, the Internal Revenue Service was investigating the tax liability of Associated for the years 1944 through 1947. When Goodman was interrogated by Internal Revenue Agents in 1950, he signed an affidavit relating that Samuel Berman, Secretary of Associated, who resided in Philadelphia, had directed him not to ring up on the cash register or enter in the books certain receipts from cash sales of jewelry but to forward this money by Railway Express to Berman at the main Philadelphia office. Goodman had prepared a memorandum of these alleged instructions and had placed it in his safe deposit box in a Norfolk bank. He took the agents to the box and they extracted therefrom the memorandum confirming this arrangement. They found in the box another paper, purportedly a summary of the amounts of cash sent by Railway Express in packages to the Philadelphia office of Associated, marked for the attention of Samuel Berman. In his affidavit, Goodman claimed to have received $5,000 from Mr. Berman for following instructions. Goodman's employment was terminated in 1950, following his disclosures to the agents, and he was then employed by a competitor in Norfolk where he continued to reside until early 1957.

■ In June of 1953, Associated was notified by the Commissioner of Internal Revenue that he had determined certain tax deficiencies and penalties against it for the years 1944 to 1948. In September of the same year, Associated instituted a proceeding in the Tax Court seeking a redetermination of these deficiencies. At the hearing before the Tax Court on June 13, 1955, and after Associated had presented evidence, the Commissioner called Goodman, who had been served with a subpoena duces tecum, as his first witness. Goodman, however, on the advice of counsel, refused to answer several questions relating to his activities with Associated before 1950 and to his affidavit.[1] He invoked his Fifth Amendment

---

1. Goodman refused to identify what purported to be his signature on the affidavit made in 1950 and refused to state whether he signed it. He would not say whether, prior to 1943, daily reports of collections at the Norfolk store were mailed to the corporation's Philadelphia offices, or whether in 1943 he had been given in-

privilege against self-incrimination.[2] At the Government's request, the Tax Court hearing was then adjourned and the Government filed a motion in the District Court seeking an order compelling Goodman to answer.

Hearings were held in the District Court in December 1955 and May 1959. On June 14, 1956, Goodman submitted to the court an affidavit purporting to disclose his reasons for declining to answer in the Tax Court and to show his good faith in the claim of his constitutional privilege. One of the several reasons assigned was that many of the assertions in his 1950 affidavit were false and that if he were forced to disclose the actual facts he might be implicated in a continuing conspiracy to evade the federal income tax law. Another reason was that from 1944 through 1950 he was engaged in certain business transactions other than those connected with his immediate employment and to disclose them might give rise to a prosecution on the theory that certain amounts had been omitted from his gross income. It was intimated, as a further reason, that he might have been charged with embezzlement since he had been making reimbursements to Associated out of salaries and commissions for a period of more than one year prior to termination of his employment.

The long delays in holding hearings were attributed by the District Court to counsel for both the Government and Goodman and to the congested condition of court dockets. Finally, in January 1960, the District Court entered the order from which this appeal was taken. It directed Goodman to answer the questions propounded in the Tax Court proceedings, to give testimony with respect to all matters embraced or included in the sworn statement given to the Internal Revenue Agents and to produce the documents and other data called for by the subpoena duces tecum. The order further provided that, in event of noncompliance therewith, Goodman should appear before the District Court, as he might be directed, to show cause why he should not be required to obey the order and why he should not be held in civil contempt. The court held that there was no possibility of self-incrimination since any illegal activities suggested by the evidence ended upon termination of Goodman's employment in 1950 and prosecution for a continuing conspiracy was thus barred by the six-year statute of limitations;[3] and that prosecution for other suggested possible offenses was barred by the appropriate limitations statutes.

The District Court, after reviewing the facts purportedly disclosed in the 1950 investigation, stated [178 F.Supp. 342]:

"Such facts, assuming that a criminal act has been committed, suggest that Goodman was a party to a conspiracy to fraudulently evade and defeat the payment of income taxes."

The court concluded:

"Assuming arguendo that Goodman had not waived his privilege of self-incrimination, and that the period of limitation had not expired on June 13, 1955, when he refused to answer certain questions in the Tax Court, it is abundantly clear that Goodman may no longer be prosecuted, tried, or punished for any federal crime committed in connection with the handling of cash sales of the corporate taxpayer."

---

structions to change the method of reporting cash sales to Philadelphia. He further refused to tell if he had ever sent currency to Samuel Berman at the Philadelphia office, and if Berman had given him $5,000 between 1943 and 1947 in addition to his regular compensation. Finally, Goodman declined to identify the memorandum found in his safe deposit box which recited the instructions he had allegedly received.

2. There is no question that the appellant, a witness in a Tax Court proceeding, is entitled to the benefit of the Fifth Amendment privilege if the danger of self-incrimination exists. Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110.

3. 26 U.S.C.A. § 6531.

The court further held that in view of the appropriate statutes of limitation, Goodman could not, at the date of the final order, be prosecuted for possible perjury committed in 1950, for embezzlement of his employer's funds, for possible tax evasion for failure to report his own income prior to 1950 or for conspiracy with representatives of Associated, which conspiracy ended in 1950. We cannot say that the District Court erred in these particulars.

In determining whether a witness is or is not entitled to invoke his Fifth Amendment privilege against self-incrimination, certain basic principles must be considered and applied. Many cases are to be found in which such privilege has been asserted and has been either denied or upheld. It is quite unnecessary, even if it were possible, to here attempt to refer specifically to all of these cases and point out their distinguishing features. In selecting persuasive applicable authority from which general principles may be deduced, each case must be analyzed in the light of the factual situation there presented.

The Government suggests that Goodman's disclosures to the federal agents in 1950 constituted a waiver of his Fifth Amendment privilege asserted in the Tax Court hearing. This argument is entirely without merit and has been repeatedly rejected by the courts. It has been uniformly held that a prior disclosure to investigating officials cannot constitute a waiver of the privilege with respect to the same matter in a subsequent legal proceeding. A waiver of the privilege must occur in the same proceeding in which it is sought to be invoked. Poretto v. United States, 5 Cir., 1952, 196 F.2d 392; Marcello v. United States, 5 Cir., 1952, 196 F.2d 437; In re Neff, 3 Cir., 1953, 206 F.2d 149, 36 A.L.R. 2d 1398; and United States v. Miranti, 2 Cir., 1958, 253 F.2d 135.

Of course, if by reason of the statute of limitations there remains *no possibility* that a prosecution of the witness could result from or be assisted by his answers to questions, he is not justified in refusing to answer. Brown v. Walker, 1896, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819; Hale v. Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652.

In reviewing the development of applicable principles, we note the case of Counselman v. Hitchcock, 1892, 142 U.S. 547, 12 S.Ct. 195. Involved was a grand jury investigation of possible violations of the Interstate Commerce Act, 49 U.S. C.A. § 1 et seq., by a certain railroad. Counselman, who had received rates from this particular road, declined to answer whether he had ever been offered or had obtained any rebates, drawbacks or commissions. The court upheld him in refusing to answer and stated 142 U.S. at page 562, 12 S.Ct. at page 198:

"It is impossible that the meaning of the constitutional provision can only be that a person shall not be compelled to be a witness against himself in a criminal prosecution against himself. It would doubtless cover such cases; but it is not limited to them. The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime."

This statement could well have been amplified by adding "for which he might be prosecuted" at the end of the above quotation.

Brown v. Walker, supra, 161 U.S. 591, 16 S.Ct. 644, was a similar interstate commerce case where, as a result of the decision in the Counselman case, Congress had statutorily provided that persons testifying in such matters should have complete immunity from prosecution. The court upheld the immunity statute and held that it furnished an absolute protection against subsequent prosecution, noting, however, that *the privilege against self-incrimination was not to be invoked in cases where the testimony could not possibly be used in a prosecution against the witness or where prosecution would be a mere imaginary possibility, remote and improbable.* The

court, by way of caution (161 U.S. 600, 16 S.Ct. 648), said this:

"The danger of extending the principle announced in *Counselman v. Hitchcock* is that the privilege may be put forward for a sentimental reason, or for a purely fanciful protection of the witness against an imaginary danger, and for the real purpose of securing immunity to some third person, who is interested in concealing the facts to which he would testify. Every good citizen is bound to aid in the enforcement of the law, and has no right to permit himself, under the pretext of shielding his own good name, to be made the tool of others, who are desirous of seeking shelter behind his privilege."

The claim of constitutional privilege against self-incrimination was upheld in Hoffman v. United States, 1951, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118, United States v. Miranti, 2 Cir., 1958, 253 F.2d 135, and Internal Revenue Agent v. Sullivan, D.C.W.D.N.Y.1923, 287 F. 138. But in each of those cases there existed a fact situation which provided a reasonable basis for the determination, in effect, that it was impossible to assess the practical possibility of future prosecution resulting from the answers to the posed questions. Those cases are easily distinguishable from the instant case.

In Mason v. United States, 1917, 244 U.S. 362, 365, 37 S.Ct. 621, 622, 61 L.Ed. 1198, the court denied Mason's claim of privilege and stated:

"The constitutional protection against self-incrimination 'is confined to real danger, and does not extend to remote possibilities out of the ordinary course of law.' *Heike v. United States,* 227 U.S. 131, 144 [33 S.Ct. 226, 57 L.Ed. 450].; *Brown v. Walker,* 161 U.S. 591, 599, 600 [16 S.Ct. 644]."

And at 244 U.S. at page 366, 37 S.Ct. at page 622, the following appears:

"'* * * We think that a merely remote and naked possibility, out of the ordinary course of the law and such as no reasonable man would be affected by, should not be suffered to obstruct the administration of justice. The object of the law is to afford to a party, called upon to give evidence in a proceeding *inter alios,* protection against being brought by means of his own evidence within the penalties of the law. But it would be to convert a salutary protection into a means of abuse if it were to be held that a mere imaginary possibility of danger, however remote and improbable, was sufficient to justify the withholding of evidence essential to the ends of justice.'"

\* \* \* \* \* \*

"* * * Ordinarily, he [the trial judge] is in much better position to appreciate the essential facts than an appellate court can hold and he must be permitted to exercise some discretion, fructified by common sense, when dealing with this necessarily difficult subject. Unless there has been a distinct denial of a right guaranteed, we ought not to interfere."

While the case of Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344, rehearing denied 341 U.S. 912, 71 S.Ct. 619, 95 L.Ed. 1348, involved the question of waiver of privilege against self-incrimination, the court stated that some real danger, more than a mere imaginary possibility, must be apparent if the witness is to be sustained in his claim of privilege.

■ With the disclosed factual background here, Goodman argues that his testimony, which was sought to be elicited and which he declined to give, would expose him to the possibility of prosecution on the theory of a continuing conspiracy to evade the payment of Associated's income taxes. The District Court concluded there was no such possibility and we agree.

We may assume, as did the District Court, that the evidence strongly sug-

gested Goodman's participation in a conspiracy to conceal the receipt of a portion of the income of Associated through irregular procedures for several years, beginning in 1943. Undoubtedly any such conspiracy could not have been continued after 1950 *in the same manner* as before. It was then that Goodman's employment by Associated and the master and servant relationship were terminated. Indeed, Goodman testified that he resigned because he was sure he was about to be discharged. Thereafter, Goodman was in no position to continue the manipulation and handling of receipts from cash sales. In United States v. Zwillman, 2 Cir., 1940, 108 F.2d 802, 803, it was held: "If a conspiracy was shown in those earlier years it would continue unless abandoned and the defendant would have to prove abandonment in order to take advantage of the statute of limitations." In the instant case the District Court found abundant proof of such abandonment.

In addition to the termination of relationships growing out of Goodman's employment, in early 1950 he disclosed to Internal Revenue Agents his participation in withholding and forwarding cash receipts. The District Court found that he voluntarily delivered to the agents his records of instructions and of the amounts of cash allegedly sent by Railway Express, discussed these matters with the agents and executed an affidavit summarizing his acts relating to these transactions. He began working for a competitor of Associated. In February of 1950, after consulting an attorney and obtaining legal advice, Goodman filed amended income tax returns reflecting the amounts said to have been paid to him by Berman for his assistance and cooperation in manipulating the receipts from cash sales. In June of 1954 he was continuing to cooperate with the Internal Revenue Service by having his attorney deliver to a Revenue Agent for use at the trial in the Tax Court the original

papers taken from his safe deposit box, copies of which were attached to his 1950 affidavit. Goodman testified before the District Court that since 1950 he had not had any discussion with any one connected with the Associated organization about his 1950 affidavit or Associated's tax problems. He asserted that he had not been in Associated's office in Philadelphia or in the offices of the corporation's attorneys since 1950; that when contacted by representatives of Associated by telephone, he did not enter into a discussion of Associated's tax problems but referred the representatives to his attorney. The testimony of Goodman's attorney supports the strong inference that Associated had, through this attorney, threatened Goodman with civil action or prosecution for embezzlement of Associated's funds. Instead of evidencing a continuation of a conspiracy, these facts would support a conclusion that the conspiracy, if one existed, had ended and that Goodman and representatives of his former employer, his possible co-conspirators, were distinctly and definitely at odds. In addition, in his affidavit submitted to the court in 1956 in which he sought to convince the court of his good faith in claiming his privilege, he would have the court draw the inference that no such conspiracy ever existed and that his earlier statements to the agents were pure fabrications.

If Goodman was engaged in a conspiracy prior to 1950 which in that year was affirmatively terminated and abandoned, no subsequent agreement between the alleged conspirators to conceal the original conspiracy would be deemed a part thereof, nor would such agreement extend its duration and continuation.[4] In Grunewald, 353 U.S. at page 405, 77 S.Ct. at page 974, the court said:

" * * * But a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the con-

4. Grunewald v. United States, 1957, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931; Krulewitch v. United States, 1949, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790; Lutwak v. United States, 1953, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593.

spiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime."

Following the entry of the order of the District Court but prior to the presentation of this appeal, the Supreme Court handed down its decision in the case of Forman v. United States, 1960, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412. Goodman claims that this case supports his argument that, if evidence could be produced to show a conspiracy in which he participated and that he took positive steps to conceal criminal activities which had previously taken place, it is obviously possible that he might be criminally implicated in a continuing conspiracy by reason of the attempt to conceal. In the Forman case, partners held out and failed to report as income certain cash receipts, and Forman and his partner were indicted and charged with conspiracy, extending from 1942 to 1953, to attempt to evade income taxes of Forman's partner and wife for the period 1942 to 1945. The indictment did not allege that one of the objects of the conspiracy was to conceal the acts of the conspirators as in Grunewald v. United States, supra. Of the thirty-three overt acts charged, some were shown by the evidence to have been committed as late as 1953, the year of the indictment. It is of particular importance to note that in the year 1953, and not before, one of the partners first revealed the "hold-out" income and the indictment charged that the conspiracy continued only until that time. In the instant case there is nothing in the evidence to even suggest that the conspiracy, if it ever existed, continued beyond the termination and abandonment thereof in 1950. We find no support in the Forman case for Goodman's contentions.

■ The questions which were directed to Goodman in the Tax Court proceeding and which he refused to answer pertained only to acts which were shown by Goodman's own affidavit to have been performed during the years from 1943 and possibly up to 1950. The District Court has directed that he answer those questions, testify concerning the transactions and matters mentioned in the affidavit given to the Revenue Agents and obey the subpoena duces tecum. It was the District Court's holding that, at the time of the entry of its order, the prosecution of Goodman for any criminal acts committed by him within the period to which his testimony would relate was barred by the statute of limitations and we agree. The District Court stated [178 F.Supp. 345]:

"The peculiar facts of this case lead to the inescapable conclusion that the plea of privilege under the Fifth Amendment is no longer available to Goodman. As was said in Hoffman v. United States, 341 U.S. 479 [71 S.Ct. 814, 95 L.Ed. 1118] the cases must be decided as much on the personal perception of the trial judge in viewing the surrounding circumstances of the case as upon the evidence."

It is clear that Goodman's asserted apprehensions indicated nothing more than a fear of imaginary danger and were without substantial foundation. Such a remote, unsupported, naked and imaginary possibility, out of the ordinary course of the process of the law, should not be permitted to obstruct the administration of justice and it is not sufficient to justify the withholding of evidence which may be essential to the Government's case in defending against Associated's claim for tax refunds.

It is urged that the District Court's order is so broad, indefinite and unspecific that it cannot serve to guide Goodman in his further testimony before the Tax Court. We find this argument to be unpersuasive.

■ There is yet another feature of this case to which consideration must be given in reaching a final determination and disposition. It has been held that the burden of proof is on the party objecting to the invocation of the privilege not only to show that the statutory period of limitation has expired, but also that no prosecution has been begun within that period, or, if begun, that it has been

discontinued in such manner as to protect the witness from further prosecution.[5] While the Government has met its burden of showing that there is no longer any possibility that Goodman could be prosecuted for substantive offenses committed in or prior to 1950, or for a continuing conspiracy to evade the payment of income taxes, it has not been pointed out to us that the Government introduced any evidence to show, or even attempted to inform the District Court, that no prosecution against Goodman was instituted before the time when the Government claims that limitations had run. Since this duty is stated in terms of an absolute burden, we are of the opinion that we must reverse on this technical point and remand the case to the District Court for further proceedings so as to provide the opportunity for the Government to meet this burden, if possible. The other issues in the case have been presented before this court and we express our views with respect thereto so the parties may be fully advised, in the event the Government is able to discharge its additional burden.

Affirmed in part, reversed in part and remanded for further proceedings.

SOBELOFF, Chief Judge (dissenting).

The court, while reversing in part on an incidental feature and remanding the case to give the Government an opportunity to introduce a missing link of evidence, actually upholds the Government's essential position. It decides that Goodman is not entitled to invoke the constitutional privilege against self-incrimination. With this disposition of the substance of the case I must disagree.

The majority treats this case as if it were a criminal prosecution against Goodman for conspiracy, while in my view the correct approach is whether, despite certain exculpatory evidence, there is a genuine possibility of prosecution. It has long been established that if there exists any doubt of such endangerment, the privilege against self-incrimination should be allowed, for there need be only a possibility of prosecution, not necessarily conviction, for the witness to be entitled to the benefit of the Fifth Amendment privilege. Counselman v. Hitchcock, 1892, 142 U.S. 547, 585–586, 12 S.Ct. 195, 35 L.Ed. 1110; Brown v. Walker, 1896, 161 U.S. 591, 597, 16 S.Ct. 644, 40 L.Ed. 819; Hoffman v. United States, 1951, 341 U.S. 479, 488, 71 S.Ct. 814, 95 L.Ed. 1118.

The court's opinion rests upon the basic assumption, made with a confidence which seems to me unwarranted, that Goodman's participation in any continuing conspiracy ended with his disclosures to the federal agents in 1950. It relies on the finding of the District Judge that there was such abandonment at that time. However, despite such a finding, the Government is in no way precluded from initiating a prosecution for conspiracy continuing after 1950. The finding of abandonment should not be given the weight usually accorded a trial court's finding of fact, for the issue is not whether there is evidence to support the Judge's determination that Goodman withdrew from a conspiracy in 1950. To repeat, the question is whether there exists a possibility of prosecution for conspiracy extending beyond that date. I cannot say on this record that such possibility is "imaginary."

If the record demonstrated that there was no contact between Goodman and anyone connected with Associated Barr Stores after 1950, the court's position might be stronger. The record reveals, however, that there were such contacts, although the extent is unclear. It is true, as the opinion points out, that initially Goodman testified that he had not visited Associated Barr's *office in Philadelphia* since 1950, and that when the store officials contacted him, he referred them to

5. O'Neil v. O'Neil, 1924, 55 App.D.C. 40, 299 F. 914, 916. See also: Moore v. Backus, 7 Cir., 1935, 78 F.2d 571, 101 A.L.R. 579, certiorari denied 296 U.S. 640, 56 S.Ct. 173, 80 L.Ed. 455; Southern Railway News Co. v. Russell, 1893, 91 Ga. 808, 18 S.E. 40; Lamson v. Boyden, 1896, 160 Ill. 613, 43 N.E. 781.

his attorney. But the significance of this is diminished, if not destroyed, by further elaborating testimony. This testimony did not touch the matter incidentally or tangentially merely, but was pursued doggedly and at considerable length.[1]

On cross-examination by the government attorney, Goodman stated that he had discussions with Associated Barr officials after 1950, both before and after the Tax Court proceeding, *but not in their office.* The Government persisted in its interrogation about this, asking: "Isn't it a fact, Mr. Goodman, that after 1950 that you were in Philadelphia on several occasions prior to the Tax Court hearing and that you discussed—or the Barrs discussed with you—their tax problem?" To this, Goodman at first replied that he did not remember. The Government pressed the point, asking him twice more about conferences in Philadelphia after 1950, and Goodman then refused to answer on grounds of self-incrimination. Finally, after being directed by the court to answer, Goodman admitted that there were discussions after 1950 with Associated Barr officials about the tax matter.

In this connection, a highly significant case is Hyde v. United States, 1912, 225 U.S. 347, 367–372, 32 S.Ct. 793, 56 L.Ed. 1114. One of the petitioners, Schneider, was indicted with his employer and two others for conspiring to defraud the United States in obtaining certain public lands. The conspiratorial agreement was alleged to have been made in 1901, and various overt acts were recited, including making fictitious affidavits, extending through 1903 or 1904. To some extent at least, Schneider in 1902 disclosed the conspiracy to government agents. Apparently about the same time, he also terminated his employment. His contention was that there was no showing that he *consciously* participated in any overt acts within the three year limitations period before the indictment, and

that it was error for the trial court to instruct the jury that if he had originally engaged in the conspiracy, even if he "did not do anything within the three-year period but 'remained acquiescent, expecting and understanding' that further acts should be performed, they, if performed, would be his acts, 'and would have the same effect against him as if he had done them himself.'" 225 U.S. at page 368, 32 S.Ct. at page 802. The Supreme Court, however, upheld the instruction, pointing out that affirmative action is required to effectuate withdrawal from a continuing conspiracy. In vain Schneider insisted that his termination of employment and his disclosure to federal agents constituted a withdrawal and that therefore the trial judge should not have permitted the jury to find that subsequent overt acts by other defendants were chargeable to him. This claim the Supreme Court rejected, holding that it was for the jury to decide whether his disclosures and termination of employment constituted a repudiation of the conspiracy, or whether, instead, by acquiescence he had a part in the subsequent overt acts of others.

Under the principles of Hyde, it cannot be said here that by his actions in 1950 Goodman clearly withdrew from any possible continuing conspiracy, especially in view of his subsequent contacts with officials of Associated Barr Stores. The District Court's finding in the present proceeding, that there was a withdrawal, will not be determinative in any subsequent criminal prosecution against Goodman. Just as in Hyde, it will be a question for the jury's decision in a criminal trial.

Moreover, in his 1956 affidavit Goodman did not, as the court suggests, imply that everything he revealed in 1950 was pure fabrication and that, in reality, no conspiracy ever existed. He did state in the 1956 affidavit that *some* of the 1950 assertions were false and that if forced to disclose the actual facts, he might be implicated in a continuing con-

---

1. This particular interrogation extends over 57 pages of the record in the District Court.

spiracy to evade the federal income tax laws.

The Government also relies upon Grunewald v. United States, 1957, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931, and Forman v. United States, 1960, 361 U.S. 416, 80 S.Ct. 481, 4 L.Ed.2d 412, arguing that the facts in the instant case are insufficient to implicate Goodman in a continuing conspiracy to evade income taxes within the doctrines of those cases, and. the court's opinion seems to adopt this reasoning. In Grunewald, however, the Supreme Court merely held that on its facts, there could not be implied an illegal subsidiary conspiracy to conceal the principal conspiracy of "fixing" criminal tax cases, thereby extending the statute of limitations beyond 1952 which was the limit for prosecuting the principal conspiracy. Since the statute of limitations had run on the principal conspiracy to "fix" criminal tax cases, and since an attempt to conceal this conspiracy did not amount to a new conspiracy thereby extending the statute of limitations, the Court reversed the convictions. Yet, the Court did give specific approval to the theory that there may have existed a single conspiracy, the central object of which was to immunize the taxpayers from tax evasion prosecution, and limitations on this would have only begun to run in 1952. This possibility was deemed to possess sufficient vitality to induce the Supreme Court to remand for a new trial under this alternative theory. The Grunewald case held only that mere concealment of a conspiracy does not constitute a new conspiracy permitting prosecution after limitations upon the first conspiracy have run. It did not do away with prosecutions for continuing conspiracies to evade the payment of income taxes. This is later made perfectly clear in the Forman case.

In Forman v. United States, supra, decided after the District Court's decision in the present case, Forman and one Seijas, who were together engaged in operating pinball machines, were accused of having extracted and retained "holdout" money from the machines. This money was neither entered on their books nor included in their tax returns. In 1953 they were indicted for a continuing conspiracy extending from 1942 to 1953 to "evade the taxes of Seijas and his wife for 1942–1945, inclusive, by concealing their 'holdout' income." 361 U.S. at page 423, 80 S.Ct. at page 486. Many overt acts were alleged, including making false statements, some as late as 1953. The Supreme Court held that the law recognizes such continuing conspiracies and that the evidence in the case supported the charge. Although 1945 was the last year in which taxes were not paid, the statute of limitations, it was held, would not have begun to run until the last overt acts aimed at concealing the "holdout" income took place in 1953.

Turning to the instant case, instead of furnishing support for the Government's argument, the teaching of Forman is that Goodman was justified in asserting the privilege against self-incrimination. The facts revealed by Goodman are entirely consistent with the continuing conspiracy theory expounded in the Forman case. In fact, there is a striking factual parallel between the two cases, although the evidence against Goodman is, at this point at least, less extensive. If the Government should later decide to initiate a prosecution, its theory could well be that Goodman and his employers entered into a continuing conspiracy to evade taxes on income from the sale of jewelry up to 1950, while he was store manager, and that the object of this conspiracy was not and could not have been fully attained until 1957, six years after the filing in 1951 of the return for the last tax year, 1950. In that view limitations would not have *begun* to run until 1957, and Goodman might be vulnerable to prosecution until 1963. To avoid a defense of limitations the Government need prove only that some act was done in furtherance of the conspiracy at any time from its inception up to the accomplishment of its purpose.

Indeed, there may be available an alternative theory under which limitations may still not have begun to run because

Goodman may not have affirmatively withdrawn from the conspiracy. We have seen from the Hyde case, supra, that a party may be deemed to be engaged in a continuing conspiracy if the evidence does not show affirmatively that he actually abandoned it, which becomes a jury question at the criminal trial. In United States v. Zwillman, 2 Cir., 1940, 108 F.2d 802, 803, an attempt was made as late as 1939 to interrogate the witness about his relations with possible co-conspirators as early as 1928. The Court of Appeals, however, held that such interrogation was improper and that the witness was entitled to invoke his Fifth Amendment privilege, saying: "If a conspiracy was shown in those earlier years it would continue unless abandoned and the defendant would have to prove abandonment in order to take advantage of the statute of limitations." The court's opinion in the present case, agreeing with the District Court, finds such abandonment. However, if he is prosecuted, Goodman will have the burden, as the Zwillman case points out, of proving affirmatively that he withdrew from the conspiracy. A jury might well take the view, as permitted by the Hyde case, that despite Goodman's disclosures to government agents in 1950, later recanted, and the termination of his employment at that time, this did not in fact constitute repudiation of the conspiracy. Whether the Government could successfully sustain an indictment in a tax conspiracy case on the theory that a continuing conspiracy might be of indefinite duration, not ending until affirmative abandonment, need not be decided here. Considering the ingenious resort by prosecutors, with not infrequent success, to the doctrine of conspiracy, one cannot say with certainty that the Government would not attempt this. For present purposes this is enough.[2]

The continuing conspiracy cases, as shown above, pointedly establish that a limitations defense in this area is quite different from that in prosecutions for other crimes. When the statute may begin to run is not, as a general matter, at all clear cut. It may differ in diverse cases depending upon particular factual details. Therefore, where any indication of a continuing conspiracy exists a court should incline against disallowing the privilege on the ground of limitations.

Moreover, by its argument that the facts of this case are insufficient to establish a conspiracy extending beyond 1950, under the principles of Grunewald and Forman, the Government misconceives the very purpose of the Fifth Amendment. To stand upon his constitutional rights, the witness is not obliged to show that he has actually violated the law. If such a requirement were exacted, the object of the privilege against self-incrimination would be completely frustrated. Justice Clark, in the opinion for the Court in Hoffman v. United States, 1951, 341

2. True, evidence of activities, Goodman's own or those of others, within six years of the indictment, would have to be shown, but the testimony could and likely would take a wider range. The circumstances of Goodman's affidavit and his conduct in the tax years 1944 to 1947, particularly any transactions with Berman in those early years, such as the payment to him of additional compensation pointedly inquired about in one of the questions propounded, would be relevant to establish the continuing conspiracy. The answers demanded of him in the Tax Court pertain to acts in the earlier stages of such continuing conspiracy. They would supply a link in the chain of proof, despite the lapse of time. Thus, the testimony pressingly sought from this witness still has potency to assist in his conviction, by bringing out or leading to information pertinent to prosecution. A continuing conspiracy may be of long duration and take a variety of forms, and any evidence, however remote in time, even evidence not directly establishing overt acts, but which is background explaining the nature, origin and progress of the conspiracy may be shown. Thus, Goodman may reasonably fear that testimony sought to be elicited from him by the challenged questions could tend to incriminate him. Such compulsory self-incrimination the Constitution forbids.

U.S. 479, 486–487, 71 S.Ct. 814, 818, made this clear:

> "However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered *might be dangerous* because injurious disclosure *could* result." (Emphasis supplied.)

Rather than reveal facts indicating that the witness has engaged in criminal activity, he need only show that answering the questions could furnish a "link in the chain of evidence needed to prosecute the claimant for a federal crime." Hoffman v. United States, supra, 341 U.S. 486, 71 S.Ct. 818. See also: Blau v. United States, 1950, 340 U.S. 159, 71 S. Ct. 223, 95 L.Ed. 170; Grunewald v. United States, supra, 353 U.S. 422–423, 77 S.Ct. 963; Poretto v. United States, 5 Cir., 1952, 196 F.2d 392; United States v. Coffey, 3 Cir., 1952, 198 F.2d 438; United States v. Trigilio, 2 Cir., 1958, 255 F.2d 385. Nor is this a doctrine of recent origin; it was enunciated by Chief Justice Marshall a century and a half ago in one of his most celebrated cases. United States v. Burr, 1807, 25 Fed.Cas. page 38, No. 14,692e.[3]

Because I believe that Goodman has revealed enough to show that he is in danger of prosecution, despite the Government's presently projected theory concerning the running of the statute of limitations, and because answers to the questions asked could furnish "links in the chain" of evidence leading to his prosecution, I would uphold his right to invoke the Fifth Amendment privilege against self-incrimination. Instead of remanding the case for the narrow purpose of allowing the Government to supply a necessary item of evidence which it had apparently overlooked, while at the same time affirming the District Court's decision on the principal point that Goodman is not entitled to rely upon the Fifth Amendment, I think that the order of the District Court should be reversed in its entirety.

3. It is in order to note yet another reason why a witness, insisting on his Fifth Amendment privilege, should not be pushed too far toward showing complicity in criminal activity. As has been repeated many times, "[t]he privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." Slochower v. Board of Higher Education, 1956, 350 U.S. 551, 557–558, 76 S.Ct. 637, 641, 100 L.Ed. 692. See also Grunewald v. United States, supra, 353 U.S. 421, 77 S.Ct. 963; Griswold, The Fifth Amendment Today (1955). While it is probably true, as the Government asserts, that the facts are insufficient to show that Goodman was involved in a conspiracy to evade the payment of income taxes continuing after 1950, this does not deprive him of his privilege against self-incrimination. He may not actually be guilty of a continuing conspiracy to violate the internal revenue laws, but may still be in danger of prosecution for such conspiracy if forced to answer questions concerning his activity. As previously mentioned, if there is a possibility that the witness will so endanger himself, he is entitled to the benefit of the privilege, whether he be innocent or guilty.