CHARLES MATARESE and ANGELA MATARESE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Matarese v. Commissioner
Docket No. 7659-72.
United States Tax Court
T.C. Memo 1975-184; 1975 Tax Ct. Memo LEXIS 187; 34 T.C.M. (CCH) 791; T.C.M. (RIA) 750184; June 12, 1975, Filed Benjamin Lewis and David L. Kitzes, for the petitioners. Barry D. Gordon and William K. Carr, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1967 and 1968 in the amounts of $10,467.48 and $31,083.51, respectively, and determined additions to tax under section 6651(a), I.R.C. 1954, [1] in the respective amounts of $2,708.72 and $7,914.31, and additions to tax under section 6653(a) in the respective amounts of $523.37 and $1,554.18. The issues for decision are: (1) Whether amounts received by Charles Matarese in the taxable years 1967 and 1968 from Nathaniel Ratner are includable in petitioners' taxable income; (2) the amount of capital gain realized by petitioners in the calendar year 1968 upon the sale of a beach house; (3) whether petitioners' failure to timely file their Federal income tax returns for the calendar years 1967 and 1968 was due to reasonable cause *189 so that they should not be liable for the additions to tax for failure to timely file under section 6651(a); and (4) whether any part of petitioners' underpayment of tax, if any, for the calendar years 1967 and 1968 was due to negligence or intentional disregard of respondent's rules and regulations so as to cause them to be subject to the additions to tax provided for under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided in Brooklyn, New York at the time the petition in this case was filed, filed their joint Federal income tax returnsfor the calendar years 1967 and 1968 with the district director of internal revenue, Brooklyn, New York on September 9, 1969. Petitioners kept their records and filed their tax returns on the cash method of accounting. During the years 1967 and 1968 Charles Matarese (hereinafter referred to as petitioner) was an employee of RGR Construction Corporation. This corporation was engaged in the business of being general contractors and builders. Petitioner was employed as a superintendent and during the years here in issue was paid a salary for his services *190 of $13,250 a year. The owner of the stock of RGR Construction Corporation and its president during the years 1967 and 1968 and for a number of years prior thereto was Nathaniel Ratner. The RGR Construction Corporation has been in business since approximately 1948. Petitioner first became employed by that corporation in 1956. Nathaniel Ratner is married but has no children. He has known petitioner for about 20 years and their relationship has been very close and intimate, almost like a father and son relationship. Beginning in 1965 Mr. Ratner advanced funds to petitioner by his personal check. Mr. Ratner's net worth is in an amount in excess of seven figures and has been since before 1967. Mr. Ratner would draw checks in favor of petitioner for advancement of funds at petitioner's request and did not know the purpose for which the funds were to be used other than for a personal need of petitioner. The source of all of the funds advanced to petitioner by Mr. Ratner was from his personal checking account and neither Mr. Ratner nor RGR Construction Corporation or any other business controlled by Mr. Ratner claimed any deduction for any of the amounts advanced to petitioner by Mr. Ratner *191 by personal check. During the calendar year 1967 Mr. Ratner made advances to petitioner by personal check in the following amounts on the dates indicated: Amount of Date
Payment
1/11
$ 391.00
1/31
861.00
3/31
3,989.50
4/10
10,380.34
5/12
3,333.33
6/14
600.00
7/1
5,400.00
9/7
3,454.00
9/7
2,588.00
9/27
333.33
Total Payments
$31,330.50
During the calendar year 1968 Mr. Ratner made similar advances on the dates indicated and in the following amounts: Amount of Date
Payment
1/18
$ 2,110.00
3/7
261.00
4/5
9,800.00
4/23
10,200.00
5/20
11,000.00
6/11
4,470.00
7/3
5,000.00
7/3
5,000.00
9/13
1,579.80
10/3
15,000.00
12/5
861.16
Total Payments
$65,281.96
Petitioner offered to give Mr. Ratner notes and to give him a mortgage on his home in Brooklyn and a summer home he had in upstate New York, but Mr. Ratner refused to take notes or any form of security for the advances. Petitioner has not repaid to Mr. Ratner any part of the amount which he received from Mr. Ratner during the years 1967 and 1968. Subsequent to 1968 Mr. Ratner made further advances to petitioner and at the time of this trial in 1974 *192 the total amount of such advances was approximately $240,000. In addition to the property which petitioner owns in upstate New York on which there is no mortgage and the home he owns in Brooklyn which he estimated to be worth in excess of $150,000 in 1974 and on which the mortgage was only approximately $2,000 in 1974, petitioner and his mother own property in the Bay of Naples which is called "Island of Eastket" and which they acquired by inheritance from petitioner's father. At the time of the trial in 1974 petitioner was being paid $300 a week as a construction superintendent for RGR. Petitioner had been under investigation by agents of the Federal Government for approximately 5 years at the time of the trial of this case. The agents had investigated his mother and brother and had checked at banks and with his neighbors and, in petitioner's opinion, the reason for this was because of his recommendation of a workman for another individual. Because of these investigations petitioner was afraid of incriminating himself if he answered certain specific questions about his business affairs. In 1959 petitioners acquired a summer camp-type property in Patchogue, Long Island. The building *193 on the property was rustic and was unheated. Petitioners used this property as a summer cottage for themselves and their children prior to 1967. Commencing in 1967 petitioners rented the property for a period of approximately 8 months. In 1968 the person to whom petitioners were renting died and petitioners decided to sell the property and did sell it in the year 1968 for $8,000. Petitioners paid a commission $480of to a real estate agent on the sale of the property and paid closing costs to attorneys of $200 in connection with the sale of the property. For a number of years prior to 1967 petitioners' tax returns had been prepared by a public accountant named Walter Richardson. Mr. Richardson died in 1972 prior to the trial of this case. Petitioner would take his Form W-2 for his salary to Mr. Richardson for the preparation of his tax return by Mr. Richardson. The only items shown on petitioner's returns for the years prior to 1967 and for the years 1967 and 1968 as prepared by Mr. Richardson consisted of his salary as shown on the W-2 form which he would furnish Mr. Richardson and a claim for the standard deduction. Upon being informed by a notice from the Internal Revenue Service *194 that returns for 1967 and 1968 had not been filed by him, petitioner went to Mr. Richardson's home to see if the returns as prepared by Mr. Richardson could be located. At that time Mr. Richardson was very ill and Mr. Richardson's wife assisted petitioner in looking for the returns Mr. Richardson had prepared. These returns were located and were untimely filed by petitioner on the date as above indicated. Petitioner's returns for 1967 and 1968 each show wages of $13,250, the amount shown on the Form W-2 which he received from RGR Corporation. Each year the standard deduction of $1,000 was claimed on the return and exemptions claimed for petitioner and his wife and their 2 children in 1967 and one child in 1968. Respondent in his notice of deficiency to petitioners increased petitioners' income as reported by the following amounts: 1967
1968
Other income
$31,330.50
$65,281.96
Interest income
10.28
114.83
Rental income
573.91
294.62
Long-term capital gain
0
4,256.00 Respondent explained the increases in income of $31,330.50 and $65,281.96 by stating that these amounts were payments made to petitioner by "Nathaniel Ratner, president of RGR Construction *195 Corporation and your employer," and "[since] it has not been established that such payments constitute loans to you, it is determined that they are includible in your gross income * * *." The interest income as determined by respondent is not here in issue nor is the rental income. In the computation of the rental income respondent allowed a deduction from the gross rental of $960 in 1967 of depreciation of $184, and from the gross rental of $640 in 1968 allowed depreciation of $123. Respondent computed the long-term capital gain on the sale of petitioners' beach house in Patchogue Island as follows: Selling price
$8,000
Less: Cost
$5,400
Depreciation allowed
or allowable (9 yrs.
at $184)
1,656
(3,744)
Long-term capital gain
$4,256
Subject to 50% deduction
(2,128)
Increase to taxable income
$2,128
Respondent in his notice of deficiency computed petitioners' deductions on a basis of itemized deductions, allowing the following itemized deductions in the years 1967 and 1968: 1967
1968
Real estate tax
on Royce Street
$ 962.06
$ 986.29
Real estate tax
on Putnam House
300.45
325.74
Mortgage interest
on Royce Street
616.67
555.30
New York State
income tax
312.00
312.00
New York City
income tax
65.00
65.00
Additional sales tax
270.00
1,170.00
Total itemized de-
ductions
$2,526.18
$3,414.33
Standard deduction
claimed on return1,000.00
1,000.00
Decrease to taxable
income
$1,526.18
$2,414.33
*196 OPINION Section 61(a) defines gross income to mean all income from whatever source derived. Sections 71 through 83 list items specifically included in gross income and sections 101 through 124 list items specifically excluded from gross income in whole or in part. Although section 61, in defining gross income, lists 15 specific items which are included, it is specifically provided that gross income is not limited to such items. A broad interpretation has been given to the definition of gross income. The language has been given a liberal construction "in recognition of the intention of Congress to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430 (1955). However, it has been long recognized that advancements in the nature of loans are not income. E. C. Gatlin,34 B.T.A. 50 (1936). In the Gatlin case we pointed out that advances in the nature of loans which were to be repaid are in the nature of a capital transaction which results in no gain to the recipient of the loan and that even though a transaction *197 may be arranged in such a way that it would violate a law, such as the usury law of a state, if it is in fact a loan, it is not income to the recipient of the loan. It is a well recognized principle that whether advances to a taxpayer are loans is not governed by the form of the transaction, but the substance of the transaction must determine its nature and the substance is dependent on all the facts surrounding the transaction as shown in the individual case. United States v. Henderson,375 F. 2d 36 (C.A. 5, 1967). Although the question of whether a bona fide debtor-creditor relationship exists is one of fact, an essential element which the facts must show in order for a transaction to be considered a loan is an intent on the part of the recipient of the funds to make repayment and an intent on the part of the person advancing the funds to require repayment. Irving D. Fisher,54 T.C. 905, 909-910 (1970). Clearly the Court is not bound to accept the statement of the interested party to the transaction as to his intent but must make its own determination *198 from all the evidence of record. In most instances issues of whether an advance to a taxpayer is a loan have arisen in the context of the advance being compensation, a gift, a contribution to capital, or a dividend if it is not in fact a loan. For example, in Anson Beaver,55 T.C. 85 (1970), we held that an amount received by a taxpayer from the corporation by which he was employed was not a loan but was in fact compensation for future services and therefore taxable income. In making this determination we pointed out, at 91: If the advances were loans, it is obvious that they did not constitute taxable income. On the other hard [sic], if the advances were compensation for services, even though those services were to be performed in the future, they constituted taxable income in the years received. * * * In William Francis Mercil,24 T.C. 1150 (1955), we were concerned with payments made by a son to his father which the taxpayer-son contended were interest payments on a loan previously made to him by his father to enable him to complete his medical education. In that case the son had deducted the monthly payments as interest on the purported *199 loan. In holding that no loan was in fact made to the taxpayer by his father and therefore the amount paid by the son to the father in the years there in issue were not deductible interest we stated at 1153: The transaction herein was not at arm's length, as between strangers, but was between father and son, and being so, it is subject to rigid scrutiny for the purpose of determining its actualities. Evans Clark,supra; Estate of Carr V. Van Anda,supra; and Jacob Grossman,9 B.T.A. 643. Furthermore, there is in the law a presumption that money or property transferred by a parent to his child is a gift or advancement, and not a loan. Jacob Grossman,supra;Storey v. Storey,214 F. 973; Jenning v. Rohde,109 N.W. 597 (Minn.); Stahn v. Stahn,256 N.W. 137 (Minn.); State v. One Oldsmobile Two-Door Sedan,35 N.W. 2d 525 (Minn.); Oliva v. Fernandez,68 F.2d 338; and Bankers' Trust Co. v. Bank of Rockville Center Trust Co.,168 Atl. 733 (N.J.). And in the case last cited, the court said: "To overcome such presumption of gift from a father *200 to a son, the proof offered to accomplish it must be certain, definite, reliable, and convincing, and leave no reasonable doubt as to the intention of the parties. * * *" Numerous cases have arisen involving whether advances by stockholders to a corporation are loans or contributions to capital. See, for example, Motel Corp.,54 T.C. 1433, 1436-1437 (1970), and cases there cited. Other situations have involved amounts advanced by a corporation to a shareholder in the form of a loan and the question has been whether in fact there was a loan or the advance was a corporate dividend. William C. Baird,25 T.C. 387, 394 (1955). And, finally, there have been numerous cases arising where a taxpayer claimed a bad debt deduction with respect to an advance to a member of his family and we have held that such a transaction required close scrutiny, "the presumption being that the transfer between related parties is a gift." Elizabeth N. Rude,48 T.C. 165, 172 (1967). The transaction here fits none of the general patterns with respect to the determination of loan as compared to a transaction of some other specific nature. The advances here *201 to petitioner were not by petitioner's employer, R G R, but rather personally by Mr. Ratner. Respondent does not contend that the advances by Mr. Ratner to petitioner were compensation to petitioner for services. The record is reasonably clear that petitioner had no interest in his employer-corporation other than being an employee and that the pay he received for the work he did was adequate. The advances by Mr. Ratner to petitioner were not transactions between petitioner and his employer-corporation but advances to petitioner by Mr. Ratner personally. No deduction of any type was taken by the corporation or were the advances in any way related to the corporation. The only case that deals with whether advances by one individual to another constitute income to the recipient of the advances where there is no employer-employee relationship between the person making the advances and the taxpayer receiving them to which our attention has been called is Fairchild v. Commissioner,462 F. 2d 462 (C.A. 3, 1972), affirming per curiam a Memorandum Opinion of this Court. The facts in the Fairchild case are vastly different from those in the instant case. The advances made *202 by an individual to the taxpayer in the Fairchild case were made on the representation by the recipient that he was developing a business which would be owned 50 percent by the person making the advances. As the Circuit Court pointed out in affirming the case, we found that the taxpayer received the money and used it as his own, with no intention to make repayment at the time of receipt. Although as the Circuit Court pointed out, we made no explicit finding of fraud, the facts bore a close resemblance to those cases in which amounts obtained through embezzlement or extortion have been held to constitute income to the embezzler or extortioner. See James v. United States,366 U.S. 213 (1961), in which the Court stated, at 219-220: When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." North American Oil Consolidated v. Burnet, supra, 286 U.S. at page 424, 52 S.Ct. at page 615. *203 In such case, the taxpayer has "actual command over the property taxed--the actual benefit for which the tax is paid," Corliss v. Bowers, supra [281 U.S. 376, 50 S.Ct. 336]. This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans. When a lawabiding taxpayer mistakenly receives income in one year, which receipt is assailed and found to be invalid in a subsequent year, the taxpayer must nonetheless report the amount as "gross income" in the year received. United States v. Lewis, supra; Healy v. Commissioner, supra. We do not believe that Congress intended to treat a law-breaking taxpayer differently. Just as the honest taxpayer may deduct any amount repaid in the year in which the repayment is made, the Government points out that, "If, when, and to the extent that the victim recovers back the misappropriated funds, there is of course a reduction in the embezzler's income." Brief for the United States, p. 24. [Footnote omitted.] [Emphasis supplied.] In this case we have a situation that would more commonly arise were we asked to determine whether the advances by Mr. Ratner to petitioner were loans or gifts. The evidence shows, *204 and in fact respondent stresses the fact that it does show, that Mr. Ratner had no natural children and his relationship with petitioner was that of father and son. However, even though there are intimations throughout the record and throughout petitioner's brief that if the evidence is not sufficiently strong to justify petitioner's position that the advances were bona fide loans, we should conclude, because of the relationship between petitioner and Mr. Ratner, that the advances were gifts, there is no clear argument to this effect made by petitioner. Petitioner's answer to respondent's determination is that the advances of Mr. Ratner to petitioner were loans. Therefore we must weigh the evidence in the record and determine whether, in our view, the advances made in the years 1967 and 1968 were in fact bona fide loans. If we conclude they were not loans without holding that in fact the advances were gifts, it would follow under the broad definition of "income" in section 61(a) that we should consider the advances to be income. Cf. Robert A. Faesy,1 B.T.A. 350 (1925). Although the evidence shows that Mr. Ratner made further advances to petitioner in future *205 years, we are concerned only with the years 1967 and 1968 which were shortly after the beginning of the personal advances by Mr. Ratner to petitioner in 1965. The further advances came in the subsequent years and at the time of the trial in this case in 1974 the total amount of the advances had reached close to one-quarter of a million dollars. Much of respondent's argument is geared to whether petitioner had assets sufficient to repay $250,000. If we were concerned with years subsequent to 1968, it might be we would conclude that at some point Mr. Ratner's advances to petitioner had become so large that it could not reasonably be expected that petitioner would be able to repay Mr. Ratner. However, for the years here in issue the total advances were only $96,500. Both Mr. Ratner and petitioner testified that the advances were loans and that petitioner intended to repay and Mr. Ratner expected repayment. The testimony of both was that petitioner offered notes as well as mortgages on property he owned to Mr. Ratner when the advances were made but Mr. Ratner turned down the offer because of their close relationship. While the refusal of Mr. Ratner to accept a note or security for the *206 loans might be considered, because of his close relationship with petitioner, to indicate that the advances were gifts, this same close relationship also might indicate that Mr. Ratner was confident of repayment without a note or security. There is nothing in this record to indicate that the advances were other than a loan or a gift. Respondent, in arguing that we should disregard petitioner's testimony, points to what he refers to as petitioner's "evasive answers." This record would be much stronger had petitioner stated outright the exact use he made of the funds advanced to him by Mr. Ratner. We recognize that if the advances were in fact loans, the use made of the funds is immaterial, even though that use might be an illegal use. However, evidence would be stronger that the advances were loans if the usage of the funds advanced were shown, particularly if such usage had been to put the funds in assets which would be available to use in repayment of the loan. However, under the facts here present, petitioner's reluctance to state exactly the usage made of the advances is understandable. Petitioner testified to the length of time he had been under investigation by various agents *207 of the Federal Government, including the Internal Revenue Service, primarily, in his view, because of his association with another individual and instead of answering certain questions claimed the protection of the fifth amendment. Under certain circumstances where a witness in a civil case voluntarily takes the witness stand to testify in his own behalf he is not entitled to invoke the fifth amendment to refuse to answer pertinent questions on cross-examination. See Brown v. United States,356 U.S. 148 (1958). However, in this case respondent did not ask the Court to direct petitioner to answer, nor did respondent contend that because of his having testified on direct examination as to his intent to repay the advances made to him by Mr. Ratner, petitioner was not entitled to invoke the fifth amendment in refusing to specifically answer questions as to his use of the funds advanced. A witness has the right to invoke the fifth amendment in the Tax Court, and if he does so it is the burden of the party objecting to the invocation of this privilege to show that the witness is *208 not in fact in danger of prosecution. United States v. Goodman,289 F. 2d 256 (4th Cir. 1961) Where the witness who refuses to testify is the petitioner, he is not relieved of the duty of carrying his burden of proof as to error in respondent's determination of deficiency in the tax. If the evidence which would be elicited is essential to carry his burden, petitioner has failed in his proof. However, in weighing respondent's contention that petitioner was evasive in his answers to questions as to the use he made of the advances he received from Mr. Ratner, we are in our view entitled to consider the fact that it was the answer to this question which petitioner claimed would tend to incriminate him and that respondent did not contend otherwise. We must also consider the fact that the use to which the advances were put is relevant only insofar as it might be considered to support or negate the testimony that Mr. Ratner expected repayment of the advances and petitioner intended to repay. While we agree with respondent that the evidence of the value of any interest petitioner had in property in Italy is weak, [2] the record shows that respondent, in recomputing petitioner's *209 tax liability, allowed deductions for taxes on two pieces of real property located in this county and an interest deduction for mortgage interest on one piece of real property. What these properties were or their values in the years 1967 and 1968, and whether they were to any extent purchased with the funds advanced to petitioner by Mr. Ratner, is not shown in the record. The petitioner, however, did testify with respect to a summer place he owned in upstate New York and a house in Brooklyn which he estimated to be worth $150,000 in 1974. It appears that these properties may have been the properties on which the deductible real estate taxes were paid. Respondent did not attempt to rebut petitioner's estimate of the value of one of these properties. *210 We have weighed all the evidence here, including the testimony of petitioner and Mr. Ratner, and have concluded petitioner has adduced enough proof to be considered a prima facie showing that in the years 1967 and 1968 when the advances here in issue were made by Mr. Ratner to him, it was the intent of both of them that the advances were loans which would be repaid. Respondent has produced no evidence in rebuttal of the prima facie showing made by petitioner, but relies altogether on his position that his deficiency notice is presumptively correct and petitioners have failed to carry their burden of overcoming that presumption. It is axiomatic that the burden is on petitioner to show that respondent's determination in the notice of deficiency is erroneous. In cases such as the present, the quantum of proof required to discharge this burden so as to require respondent to go forward with contradictory evidence, is a difficult judgment. However, considering all the facts in this case, we conclude that petitioner has carried his burden of proof and therefore hold that respondent erroneously included the $31,330.50 of advances by Mr. Ratner to petitioner in 1967 and the $65,281.96 of *211 advances by Mr. Ratner to petitioner in 1968 in petitioner's income. The only testimony in the record in this case with respect to the Patchogue beach house is that petitioner used it as a summer place for his family until 1967 and then began to rent it. Respondent on brief concedes that the $480 commission and $200 fee paid to the attorney are properly to be added to petitioner's basis in the property or deducted from his selling price in determining his gain. The only remaining issue is the amount of depreciation which should be used to reduce the basis in the property. As respondent points out, the basis of a taxpayer in property is to be reduced by depreciation allowed or allowable. Section 1016(a)(2). However, on a beach cottage used personally by petitioner no depreciation is allowable and therefore the question here is purely factual. Respondent does not contend to the contrary but argues that we should not believe petitioner's testimony that the property was not rented from the time it was acquired in 1959 until 1967. In our view petitioner has carried his burden of proof in this *212 regard and we hold that petitioner's basis in the property should be reduced by depreciation of $184 for the year 1967 and depreciation of $123 for the year 1968, and not by any depreciation for other years. In our view the explanation given by petitioner for the late filing of his 1967 and 1968 returns is not sufficient to show a reasonable cause for his failure to timely file his income tax returns. Although petitioner attempted to place the blame for the late filing on his accountant, it is the responsibility of every taxpayer to see that his own return is timely filed. Petitioner has failed to show that the reliance he had placed on his accountant amounted to reasonable cause for failure to timely file. It is not sufficient that petitioner show that the failure to timely file was inadvertent or even that his failure to timely file was not due to "willful neglect." It is incumbent upon him to show reasonable cause for such failure. Robinson's Dairy, Inc.,35 T.C. 601 (1961). On the basis of this record, all that has been shown is that petitioner did not willfully neglect *213 to file his return but rather that it was inadvertent on his part. Such inadvertence is not reasonable cause. We therefore sustain respondent's addition to petitioner's tax for failure to timely file his returns. Respondent in his brief states that if we hold for petitioner that the $31,330.50 advance by Mr. Ratner to petitioner in 1967 and the $65,281.96 advance to petitioner by Mr. Ratner in 1968 are not includable in petitioner's income, he concedes that petitioner is not liable for the addition to tax for negligent disregard of rules and regulations under section 6653(a). Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. Petitioner stated that his father was the Lawrence Matarese who was the plaintiff in Matarese v. Moore-McCormack Lines,158 F. 2d 631↩ (2nd Cir. 1946) and made reference to the $90,000 judgment he recovered. Apparently from the case Mr. Matarese obtained a jury verdict for $90,000, reduced upon order of the Court to $40,000, on the basis that the defendant was unjustly enriched because it knowingly used Mr. Matarese's invention without compensating him. In the case, petitioner's father is described as "a man of little education, who, emigrating to this country from Italy some forty-six years ago, had always worked around the docks and in 1938 was employed as a part-time stevedore on defendants' pier. His case, which the jury quite obviously must have accepted in full, was that in August of that year he informed Furey, defendants' agent in charge of the pier, that he had something which would facilitate cargo loading and unloading, thus saving the defendants much money and preventing the numerous accidents, ordinarily occurring at the pier." His invention is described as resulting in substantial savings to the defendant. However, we do not see how the result of this case supports petitioner's position as to the value of property in Italy which he said had been in his family for many years.