DIVERSIFIED INDUSTRIES, INC., Petitioner,

v.

The Honorable James H. MEREDITH, Chief Judge of the United States District Court for the Eastern District of Missouri, Respondent.

No. 77–1043.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1977.

Decided Aug. 9, 1977.

On En Banc Hearing Feb. 5, 1978.

Henley, Circuit Judge, filed an opinion concurring in part and dissenting in part on the hearing en banc.

Gibson, Chief Judge, filed an opinion concurring in part and dissenting in part on the hearing en banc.

Bright, Circuit Judge, filed a dissenting opinion on the hearing en banc.

Thomas J. Guilfoil, St. Louis, Mo., for petitioner; Stuart Symington, Jr., Jim J. Shoemake and J. Richard McEachern, St. Louis, Mo., on the briefs.

Thomas E. Wack, St. Louis, Mo., for respondent; Walter M. Clark, St. Louis, Mo., on the briefs.

Before LAY, HEANEY and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

This is an original petition for a writ of mandamus directed at The Honorable James H. Meredith, Chief Judge of the United States District Court for the Eastern District of Missouri, by Diversified Industries, Inc. which is the defendant in a

case pending in the district court entitled *The Weatherhead Company, Plaintiff v. Diversified Industries, Inc., Defendant,* Docket No. 76–623C(1). In the instant proceeding Diversified seeks to protect from discovery the contents of a certain memorandum, dated June 19, 1975, and a written report, dated December, 1975, both prepared for the benefit of Diversified by the Washington, D. C. law firm of Wilmer, Cutler & Pickering, hereinafter called Law Firm. Petitioner also seeks to protect certain corporate minutes in which reference is made to the memorandum and report of Law Firm.

Weatherhead sought to obtain the materials in question by means of pretrial interrogatories and a motion for production of documents to which Diversified objected. In November, 1976 the district court overruled the objections without opinion. Diversified moved for reconsideration and alternatively asked the district court to certify the questions presented as appropriate for interlocutory appeal under 28 U.S.C. § 1292(b). On December 30, 1976 respondent refused both reconsideration and § 1292(b) certification, and in that connection filed a memorandum opinion. Finally, on January 6, 1977 the district court affirmatively ordered disclosure of the materials and Diversified applied to this court for relief.

Petitioner contends that the documents in question are not subject to disclosure because they fall within the scope of the traditional attorney-client privilege and also are protected by the "work product" privilege dealt with in the leading case of *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), and now expressed in Fed. R.Civ.P. 26(b)(3) which became effective in 1970.

Respondent, actually Weatherhead, denies that the material in question is covered by either privilege, and also contends that any originally existing privilege was waived effectively for purposes of the litigation in the district court when petitioner turned the material over to the Securities and Exchange Commission without protest in response to an agency subpoena in the course of an investigation that the Commission was conducting.

We heard the matter preliminarily on January 14, 1977 and entered an order staying operation of the district court's order of January 6 as it affected Law Firm's memorandum and report and portions of the corporate minutes of Diversified relating to those documents pending final disposition of the case. We also called for the filing of briefs within a comparatively short period of time.

We have considered the petition, the response thereto, the exhibits tendered by the respective parties, and their briefs. And we have also considered in camera material that was submitted to the district court and later to us. That material includes the memorandum and report of Law Firm and copies of the minutes of certain meetings of Diversified's Board of Directors.

■ The writ of mandamus is not ordinarily available to a litigant to obtain appellate review of interlocutory discovery orders entered by a district court as litigation proceeds. However, where a claim of attorney-client privilege has been raised in and rejected by a district court, we have held that mandamus is available as a means of immediate appellate review. *Pfizer, Inc. v. Lord, District Judge,* 456 F.2d 545, 547–48 (8th Cir. 1972). *See also Harper & Row Publishers v. Decker,* 423 F.2d 487 (7th Cir. 1970), *aff'd without opinion by an equally divided Supreme Court,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). We concluded, therefore, that we should consider the instant petition on the merits.

Petitioner is a Delaware corporation with its principal place of business in Clayton, Missouri. Its operations include sales of scrap copper which is the principal component of brass. Some and perhaps many of petitioner's sales are made in interstate commerce.

Weatherhead is an Ohio corporation having its principal place of business at Cleveland. It is engaged in the manufacture and sale of brass and brass products, and it maintains a mill at Angola, Indiana.

For a number of years prior to the filing of its suit against Diversified in July, 1976 Weatherhead purchased large quantities of copper from Diversified which copper was shipped from Clayton to Angola. Naturally, there were extensive dealings between employees of Weatherhead engaged in the purchasing of copper and employees of Diversified engaged in the sale of copper. Diversified sold copper not only to Weatherhead but also to other purchasers.

In 1974 and 1975 Diversified became engaged in two lawsuits in federal court in the Eastern District of Missouri, which litigation involved what is commonly known as a "proxy fight." In the course of that litigation it came to light that Diversified may have established and maintained a "slush fund" which was used to bribe purchasing agents of other business entities including Weatherhead, and perhaps for other improper purposes.

Disclosures made in the course of the 1974–75 litigation, which litigation had no direct relationship to the suit that is now pending in the district court, attracted the interest of the Securities and Exchnage Commission. In due course the Commission conducted an official investigation of the affairs of Diversified and other corporations and individuals, and it later filed a suit for an injunction against Diversified and others in the United States District Court for the District of Columbia; a consent decree was entered in that case in late 1976.

In July, 1975 Weatherhead commenced its suit against Diversified in the district court alleging an unlawful conspiracy between Diversified and Weatherhead employees whereby the latter were paid large sums of money out of Diversified's alleged "slush fund" to procure the purchase from Diversified by Weatherhead of large amounts of inferior copper. Weatherhead alleged conspiracy, tortious interference with the contractual relationships between itself and its employees, and violation of § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15. On the common law counts of the complaint actual and punitive damages and

an accounting of profits were sought. Treble damages were sought under the antitrust count. We assume that Diversified denies liability.

Weatherhead has employed extensive discovery in the case in the district court and doubtless has been able to acquire much information of value to it. However, Weatherhead has not yet been able to obtain access to Law Firm's memorandum and report.

The history of those documents may be summarized as follows.

The 1974–75 litigation involving Diversified was settled amicably and before any official action had been taken by the SEC. However, the Board of Directors of Diversified concluded that it should cause an investigation to be made of the business practices of the company in the context of the disclosures that had been made in the course of the litigation. In the spring of 1975 Law Firm was employed to make that investigation and to report the results thereof to Diversified's Board. Law Firm was not employed to give legal advice to Diversified and was not employed to represent diversified in any pending or potential litigation. The reason for the employment of Law Firm was its supposed expertise in the relevant field.

The memorandum of June 19, 1975 was of a purely preliminary nature and was written at a time when the employment of Law Firm was still somewhat tentative. Basically, the memorandum is a statement of historical matters, and an outline of how Law Firm proposed to conduct the investigation. The memorandum also discussed the extent to which information developed by the investigation would be immune from disclosure should disclosure be sought officially. As to the method of investigation, Law Firm stated that it proposed to interview individuals, including employees of Diversified, and Law Firm requested the Board to instruct corporate employees to cooperate in the investigation and to participate in interviews with Law Firm's representatives. Law Firm also indicated that it intended to examine relevant records, and

that it might find it necessary or convenient to employ an independent firm of accountants to assist in the investigation.

This memorandum was satisfactory to the Board, and Diversified employees were instructed to cooperate with Law Firm and to furnish information to Law Firm's representatives.

The December, 1975 report was quite different from the June memorandum. The December document was a full and detailed report of the investigation; it identified persons who had been interviewed and set out the substance of what they had said; it also identified individuals who had refused to give any information. The report also dealt with the accounting aspect of the investigation which had been handled by the firm of Arthur Andersen & Co. The report further contained a number of recommendations both on the part of Law Firm and on the part of the accountants.

It may be doubted that the report itself would be admissible in evidence at a trial of the Weatherhead-Diversified case, but it obviously contains a great deal of material which is relevant to the controversy between the parties, and might well be extremely useful to counsel for Weatherhead in discovering and developing relevant and admissible evidence.

Included in the in camera material that we have examined are copies of corporate minutes covering meetings of the Board held from time to time between early May, 1975 and July, 1976. Those minutes would be privileged, if at all, only to the extent that they may reveal privileged matter communicated by Law Firm.

The minutes of many of the meetings refer to the fact that Law Firm had been employed, that a report had been received including recommendations, and that the recommendations were to be followed. For the most part, however, the minutes say nothing about what was in the report or what the recommendations were.

One exception is the minutes of a meeting of the Board that was held on September 3, 1975, while the investigation was in progress. Two representatives of Law Firm attended the meeting and advised the Board as to the status of the investigation and as to some of the Law Firm's tentative findings.

The in camera material also includes a memorandum, dated January 30, 1976, from Mr. Woodlief, the President of Diversified, to all corporate officers and heads of subsidiaries and divisions of the company. And that memorandum reveals to some extent the results of the investigation.

 Coming now to the issues, it should be kept in mind that we are dealing with a claim of privilege based on two separate and distinct rules. The first is the long established rule that confidential communications between an attorney and his client are absolutely privileged from disclosure against the will of the client. That rule expresses the "attorney-client" privilege proper. The second rule is that information or materials assembled by or for a person in anticipation of litigation or in preparation for trial may be qualifiedly privileged from disclosure to an opposing party. That rule is known as the "work product" rule, and, as indicated, is now covered by Fed.R.Civ.P. 26(b)(3). Both rules are discussed thoroughly in 8 Wright & Miller, Federal Practice & Procedure, Civil, §§ 2017 and 2021–28.

In the frequently cited case of *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950), Judge Wyzanski stated the conditions under which the attorney-client privilege is applicable. He said:

. . . The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in

some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

■ A shorter definition of the privilege, cited with approval in 8 Wright & Miller, *op. cit.*, p. 133, is contained in *Wonneman v. Stratford Securities Co.*, 23 F.R.D. 281, 285 (S.D.N.Y.1959): ". . . where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal advisor except the protection be waived."

■ While the privilege, where it exists, is absolute, the adverse effect of its application on the disclosure of truth may be such that the privilege is strictly construed. *Radiant Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314, 323 (7th Cir. 1963); *Underwater Storage, Inc. v. United States Rubber Co.*, 314 F.Supp. 546, 547–48 (D.D.C.1970); *United States v. United Shoe Machinery Corp., supra*, 89 F.Supp. at 358.

■ In order for the privilege to be applicable, the parties to the communication in question must bear the relationship of attorney and client. Moreover, the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice—services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity. A communication is not privileged simply because it is made by or to a person who happens to be a lawyer. 8 Wright & Miller, *op. cit.*, p. 136. · *See Underwater Storage, Inc. v. United States Rubber Co., supra; In re Natta*, 264 F.Supp. 734, 741 (D.Del.1967), *aff'd on other issues*, 388 F.2d 215 (3d Cir. 1968); *Georgia-Pacific Plywood Co. v. United States Plywood Corp.*, 18 F.R.D. 463, 464 (S.D.N.Y.1956); *Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792, 794 (D.Del.1954).

■ Whether the parties to a given communication are, respectively, attorney and client is a question which ordinarily presents no difficulty. A problem arises, however, where the client is a corporation that can communicate or receive communications only by or through its human agents. In such a case the question arises as to whether the privilege extends to communications by or to all classes of corporate agents or employees or whether the privilege is limited to communications by or to only limited classes of such agents or employees.

On that question the authorities are clearly divided. The existing state of the law was stated succinctly by District Judge Warriner in *Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co.*, 68 F.R.D. 397, 400 (E.D.Va.1975):

Two tests exist with respect to whether an employee of a corporation is a "client" for purposes of the lawyer-client privilege when dealing with communications from such employee to the lawyer for the corporation. The test most widely employed, apparently is the "control group" test formulated by the decision in *Philadelphia v. Westinghouse Electric Corporation*, 210 F.Supp. 483 (E.D.Pa.1962). This test requires that the communicant be in a position to control or take a substantial part in a decision about any action to be taken upon the advice of the lawyer, or that the communicant be a member of a group having such authority.

The control group test was rejected in *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir. 1970), *aff'd per curiam by equally divided Court*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). The *Decker* test holds that an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's lawyer is privileged where the employee made the communication at the direction of his superiors and where the subject matter upon which the lawyer's advice was sought by the corporation and dealt with in the communication was within the performance by the employee of the duties of his employment.

Reference may also be made to the opinion of District Judge Hamphill in *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1163–67 (D.S.C.1974).

As to the work product rule, Fed.R.Civ.P. 26(b)(3) in pertinent part provides:

(3) *Trial Preparation: Materials.*

Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

. . .

■ From a reading of Rule 26(b)(3) and of the discussion of the work product rule appearing in 8 Wright & Miller, *op. cit.,* §§ 2021–28, it is at once apparent that the qualified immunity or privilege accorded to "work product" by the rule is to some extent broader than the absolute attorney-client privilege that has been discussed. While the "work product" may be, and often is, that of an attorney, the concept of "work product" is not confined to information or materials gathered or assembled by a lawyer. Further, a communication may be immune from discovery as work product even though it was not made to or by a "client" of an attorney.

■ However, the text of the rule makes it clear that the information or materials sought to be protected as "work product" must have been obtained "in anticipation of litigation or for trial." Other-

wise, the privilege, often referred to as "qualified immunity" is not available.

With the foregoing in mind, we pass to a consideration of Diversified's claim of privilege with respect to the several documents that are in controversy here.

■ We have no difficulty in upholding the action of the district court in refusing to accord protection to Law Firm's memorandum of June 19, 1975. That memorandum contained no confidential information. It did little more than reveal the relationship between the parties, the purpose for which Law Firm had been engaged, and the steps which the Firm intended to take in discharging its obligation to Diversified. Such a document is not privileged. *See Colton v. United States,* 306 F.2d 633, 636 (2d Cir. 1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); *Bailey v. Meister Brau, Inc.,* 55 F.R.D. 211, 214–15 (N.D.Ill.1972); 8 Wright & Miller, *op. cit.,* p. 138.

The questions presented with respect to the December, 1975 report of Law Firm are more difficult. We have concluded, however, that the report is not entitled to protection on the basis of either attorney-client privilege or work product immunity.

We find it unnecessary to decide whether the persons interviewed by the Firm's representatives should be considered as "clients" because we are persuaded that Law Firm was not hired by Diversified to provide legal services or advice. It was employed solely for the purpose of making an investigation of facts and to make business recommendations with respect to the future conduct of Diversified in such areas as the results of the investigation might suggest. The work that Law Firm was employed to perform could have been performed just as readily by non-lawyers aided to the extent necessary by a firm of public accountants. Thus Diversified has failed to satisfy one of the requisites of a successful claim of attorney-client privilege.

That the contents of the report constituted "work product" cannot be denied; nor is there any question that the report con-

tained the mental impressions, conclusions and opinions of those who wrote it, including their interpretations of what the interviews with individuals revealed.

However, it is obvious that Law Firm's work was not done in preparation for any trial, and we do not think that the work was done in "anticipation of litigation," as that term is used in Rule 26(b)(3), although, of course, all parties concerned must have been aware that the conduct of employees of Diversified in years past might ultimately result in litigation of some sort in the future.

■■■ It may be conceded to Diversified that material may be assembled in "anticipation of litigation" even though no suit has actually been filed. However, the work product rule does not noot come into play merely because there is a remote prospect of future litigation. *Zenith Radio Corp. v. Radio Corp. of America, supra,* 121 F.Supp. at 795.

In 8 Wright & Miller, *op. cit.,* pp. 198–99, it is said:

> . . . Prudent parties anticipate litigation, and begin preparation prior to the the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

Law Firm's investigation was not made and its report was not prepared because of any prospect of litigation involving Diversified. · Law Firm was employed simply because the Board of Directors of Diversified wanted to know what actually had been going on and wanted to frame policies and procedures that in the future would protect it against repetitions of the prior misdeeds, if any, of its employees committed in the past.

As to the corporate minutes involved in the case, little need be said. Those minutes were not privileged in themselves, and since the report of Law Firm is not privileged, the minutes are not privileged to the limited extent to which they may disclose contents of the memorandum and report.

Since we conclude that the materials are not privileged, we do not reach the question of waiver raised by Weatherhead, which is a serious one.[1]

The petition for the writ of mandamus is denied.

HEANEY, Circuit Judge, concurring and dissenting.

I agree that we should consider the petition for mandamus on its merits. I am, moreover, convinced that Diversified did not waive its lawyer-client privilege by voluntarily surrendering privileged material to the SEC in obedience to a subpoena from that agency. "A waiver of the privilege must occur in the same proceeding in which it is sought to be invoked." *United States v. Goodman,* 289 F.2d 256, 259 (4th Cir.), *vacated and. remanded on other grounds,* 368 U.S. 14, 82 S.Ct. 127, 7 L.Ed.2d 75 (1961); *Bucks County Bank & Trust Company v. Storck,* 297 F.Supp. 1122, 1123 (D.Haw. 1969); 8 *Wigmore on Evidence* § 2276 at 470–472 (McNaughton rev. 1961). *But see* Supreme Court Standard 511; *In Re Penn Central Commercial Paper Litigation,* 61 F.R.D. 453, 464 n. 25 (S.D.N.Y. 1973).

I disagree, however, with the majority's holding that no lawyer-client privilege existed as to the June 19, 1975, memorandum of Wilmer, Cutler & Pickering, to the December, 1975, report of Wilmer, Cutler & Pickering and to the minutes of the Board of Directors of September 3, 1975, to the

---

1. We would be reluctant to hold that voluntary surrender of privileged material to a governmental agency in obedience to an agency subpoena constitutes a waiver of the privilege for all purposes, including its use in subsequent private litigation in which the material is sought to be used against the party which yielded it to the agency.

extent that they contained excerpts from the law firm's memorandum or report.

The majority opinion is, in my view, contrary to Supreme Court Standard 503 relating to the lawyer-client privilege which reads, in relevant part, as follows:[1]

(a) Definitions.—As used in this rule:

(1) A "client" is a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him.

\* \* \* \* \* \*

(3) A "representative of the lawyer" is one employed to assist the lawyer in the rendition of professional legal services. (4) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.

(b) General rule of privilege.—A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communication made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and the lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

Under the standard, the privilege extends to communications between the lawyer and the client for the purposes of obtaining legal services or advice. Advisory Committee Note to Supreme Court Standard 503. The client need not be involved in litigation for the privilege to attach. *See* 8 *Wigmore on Evidence* §§ 2294–2295 (McNaughton rev. 1961).

Wilmer, Cutler & Pickering was retained by Diversified in order to obtain professional legal services. The corporation sought and indeed received something infinitely more important than a report from a lay investigator or a detective. The law firm submitted a comprehensive report detailing specific conduct considered by it to be violative of the law and characterizing various employees of the corporation as being cooperative or uncooperative with its investigation. The report contained recommendations as to a course of conduct to be followed by Diversified to avoid future violations of the law.

The Association of the Bar of the City of New York stated, in 1970, that "rules of evidence should not result in discouraging communications to lawyers made in a good faith effort to promote compliance with the complex laws governing corporate activities." Report of the Committee on Federal Courts of the Association of the Bar of the City of New York, 43–45, May, 1970, *quoted in 2 Weinstein's Evidence,* ¶ 503[01] at 503–12, n. 1. I agree with this observation. Lawyers are acting in a professional capacity when they undertake a comprehensive examination of a corporation's activities in order to determine whether the corporation is operating in accordance with the law and make recommendations on how to avoid illegal activities in the future. This is true whether or not the legal firm conducting the investigation is expected to engage in litigation.

Since, unlike the majority, I am persuaded that the law firm was retained by

---

1. Even though Congress failed to adopt Supreme Court Standard 503 as part of the Federal Rules of Evidence, it still serves as a useful guide to the law of privileges to be applied in the federal courts. The standard, with a few minor exceptions, is a restatement of the lawyer-client privilege at common law. McLaughlin, *The Treatment of Attorney-Client and Re-*

*lated Privileges in the Proposed Rules of Evidence for the United States District Courts,* 26 The Record 31 (1971). "Consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the courts." 2 *Weinstein's Evidence* ¶ 503[02] at 503–17 (1975).

Diversified to provide legal services or advice, it is necessary to determine whether the Diversified employees interviewed by the law firm, or its representatives, should be considered to be "clients" of the law firm. There are two principal approaches to this question. Under one approach, the lawyer-client privilege is limited to only those communications by and to the control group of the corporation.[2] *City of Philadelphia v. Westinghouse Electric Corp.,* 210 F.Supp. 483 (E.D.Pa.), *mandamus and prohibition denied sub nom. General Electric Co. v. Kirkpatrick,* 312 F.2d 742 (3rd Cir. 1962), *cert. denied,* 372 U.S. 943, 83 S.Ct. 987, 9 L.Ed.2d 969 (1963). This approach is not a realistic one and was expressly rejected by the Seventh Circuit in *Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487 (7th Cir. 1970), *affirmed by an equally divided Court,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). I would adopt the Seventh Circuit approach together with modifications suggested in 2 *Weinstein's Evidence* ¶ 503(b)[04] (1975). I would first require the corporation to show that the lawyer was acting as a legal adviser when the communication was made. The mere receipt by a lawyer of a routine report would not make the communication privileged. Second, I would require that the subject matter of the communication be the performance by the employee of the duties of his employment. This would remove from the scope of the privilege any communication which is within the employee's knowledge solely because he happened to witness or observe an event. Third, the corporation must establish that the communication was not disseminated beyond those with the need to know. I think it is clear that all of the requirements are met here.

In my judgment, justice will be furthered if we extend the lawyer-client privilege to situations of this type. It will encourage corporations to seek out wrongdoing in their own house and to do so with lawyers who are not only professionally trained but who are obligated by their code of ethics to make a thorough and complete report.

## ON HEARING EN BANC

Before GIBSON, Chief Judge, and LAY, HEANEY, BRIGHT, ROSS, STEPHENSON and HENLEY, Circuit Judges, en banc.[*]

HEANEY, Circuit Judge.

This matter is before the Court en banc on a petition for a writ of mandamus. When the matter was first considered, a panel of this Court held that it had jurisdiction to entertain the petition but denied the petition on its merits. *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596 (8th Cir. 1977) (Heaney, J., concurring and dissenting). It held that Diversified Industries, Inc., was not entitled to protect from discovery a memorandum dated June 19, 1975, and a report dated December, 1975, as well as certain corporate minutes and a letter dated January 30, 1976, from the President of Diversified that refer to the documents. These documents were prepared for Diversified by the Washington, D. C., law firm of Wilmer, Cutler & Pickering. It reasoned that the June 19 memorandum was not entitled to protection under the attorney-client privilege because the memorandum contained no confidential information and that the December report was not entitled to protection under the privilege because the law firm was not hired by Diversified to provide legal services or advice. It further reasoned that Diversified could not claim protection under the work product rule since the law firm did not prepare the report for trial or in anticipation of litigation as that term is used in Fed.R.Civ.P. 26(b)(3). It held the corporate minutes and the January 30 letter to be unprotected for the same reasons.

---

**2.** The control group approach was followed in the first draft of Rule 503, but was deleted in the second draft because of the 4–4 split in the Supreme Court on the issue in *Decker v. Har-*per & Row Publishers, Inc., 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971).

*WEBSTER, Circuit Judge, took no part in the consideration or decision of this case.

On petition from Diversified, we agreed to hear the matter en banc because of the important issues raised with respect to the proper application of the attorney-client privilege. After careful consideration, we leave untouched our earlier opinion insofar as it holds that mandamus is available as a means of immediate appellate review and that the June 19, 1975, memorandum is unprotected.

A brief restatement of the facts will bring into focus the issues concerning the December, 1975, report, the corporate minutes and the January 30 letter.

Diversified is a Delaware corporation with its principal place of business in Clayton, Missouri. It is engaged primarily in manufacturing and processing nonferrous metals. Weatherhead is an Ohio corporation with its principal place of business in Cleveland, Ohio. It manufactures and sells brass and brass products. For many years, Diversified sold Weatherhead large quantities of copper, the principal component of brass.

In 1974 and 1975, during proxy fight litigation involving Diversified, facts surfaced indicating that Diversified may have established and maintained a "slush" fund to bribe purchasing agents of companies with whom Diversified dealt, presumably including Weatherhead.

On July 9, 1976, Weatherhead filed a complaint in the District Court alleging that Diversified conspired with Weatherhead employees to sell Weatherhead an inferior grade of copper and that in return for accepting the inferior copper, Weatherhead employees were paid bribes out of a "slush" fund. Weatherhead also alleged tortious interference with its employment contracts and violations of § 4 of the Clayton Act, 15 U.S.C. § 15.

As a result of the disclosures made during the 1974–1975 litigation, the Board of Directors of Diversified passed the following resolution:

RESOLVED, that, as this Board of Directors deems it to be in the best interests of this Corporation and its stockholders, the General Counsel of the Corporation be and he hereby is authorized, in behalf of this Board of Directors, to engage the services of Wilmer, Cutler & Pickering, Washington, D. C. to conduct an investigation and inquiry into the matters disclosed and discussed in this regard at this meeting for the purposes of eliciting facts, making certain findings, and providing to the Board of Directors of this Corporation a report possibly containing recommendations as to course of action, so that the Board of Directors of this Corporation may properly discharge its duties, and, further

RESOLVED, that Wilmer, Cutler & Pickering be and they hereby are authorized to procure assistance as may be reasonably required, in the above-designated inquiry, from accounting firms and others to conclude in a prompt and diligent manner the above commissioned inquiry and investigation, and, further

RESOLVED, that this Board of Directors hereby delegates to the Audit Committee of this Board the power and authority to review this matter in detail with Wilmer, Cutler & Pickering and, where necessary and appropriate, to provide to that firm any necessary interim authorizations or advice as may be necessary or desirable for the efficient handling and conclusion of the above mentioned inquiry and investigation, and, further

RESOLVED, that the officers and directors of this Corporation be and they hereby are directed to cooperate fully, and to ensure that all employees of this Corporation cooperate fully with Wilmer, Cutler & Pickering and such other persons as Wilmer, Cutler & Pickering may retain in the foregoing matters.

The law firm was subsequently directed to report to the Board of Directors rather than to the Audit Committee. The company President subsequently advised employees that he would take any steps necessary or appropriate to insure employee cooperation. During the course of the investigation, the law firm interviewed several employees of Diversified, including some who were not in a position to control or take a

substantial part in a decision the corporation might make based on the law firm's advice. The December report summarized these interviews, analyzed the accounting data, evaluated the conduct of certain employees, drew conclusions as to the propriety of their conduct and made recommendations as to steps Diversified should take. Certain corporate minutes and parts of the January 30 letter restate critical portions of the report.[1]

■ The attorney-client privilege applies to corporations. *Radiant Burners, Inc. v. American Gas Association*, 320 F.2d 314, 323 (7th Cir.), *cert. denied*, 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963). However, because a corporation can speak or hear only through its human agents, we must determine the circumstances in which employee communications can be classified as the corporate client's communications.

Two tests have developed in the federal courts. The first is the "control group" test formulated in *City of Philadelphia v. Westinghouse Electric Corp.*, 210 F.Supp. 483 (E.D.Pa.), *mandamus and prohibition denied sub nom., General Electric Co. v. Kirkpatrick*, 312 F.2d 742 (3rd Cir. 1962), *cert. denied*, 372 U.S. 943, 83 S.Ct. 937, 9 L.Ed.2d 969 (1963). In this test, an employee's statement is not considered a corporate communication unless the employee "is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority[.]" *Id.* at 485. It is the most widely used test. *Virginia Electric & Pow. Co. v. Sun Shipbuilding & D.D. Co.*, 68 F.R.D. 397, 400 (E.D.Va.1975).

The second test is that formulated in *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir. 1970), *aff'd by an equally divided court*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). In this test, "an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation * * * where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment." *Id.* at 491–492.

Although it predominates, the control group test has come under increasing criticism. *See, e. g.*, Kobak, *The Uneven Application of the Attorney-Client Privilege to Corporations in the Federal Courts*, 6 Ga.L. Rev. 339 (1972); Note, *Privileged Communications—Inroads on the "Control Group" Test in the Corporate Area*, 22 Syracuse L.Rev. 759 (1971); Note, *The Application in the Federal Courts of the Attorney-Client Privilege to the Corporation*, 39 Fordham L.Rev. 281 (1970); Weinschel, *Corporate Employee Interviews and the Attorney-Client Privilege*, 12 B.C.Ind. & Comm.L. Rev. 873 (1970). *But see, e. g.*, Note, *Attorney-Client Privilege for Corporate Clients: The Control Group Test*, 84 Harv.L.Rev. 424 (1970). The principal criticism is that the control group test attempts to equate corporate clients with individual clients. An individual client both communicates to a lawyer and, based on the lawyer's advice, decides on an appropriate course of action. Similarly, before an employee's communication will be deemed the corporate client's communication, the control group test demands that the employee communicate to the attorney and be in a position to control or play a substantial role in any decision based on the attorney's advice. In practice, this results in protecting only communications of top level executives which fails to take into account the realities of corporate life.

■ In a corporation, it may be necessary to glean information relevant to a legal problem from middle management

1. In particular, the September 3, 1975, minutes discuss the contents of the report and the results of the investigation. The February 3, 1976, and March 3, 1976, minutes also discuss the investigation as applied to Mr. Harry Simmons. The remaining minutes only mention the existence of the investigation and do not reveal the contents of the report.

and nonmanagement personnel as well as from top executives. The attorney dealing with a complex legal problem "is thus faced with a 'Hobson's choice'. If he interviews employees not having 'the very highest authority', their communications to him will not be privileged. If, on the other hand, he interviews *only* those with 'the very highest authority', he may find it extremely difficult, if not impossible, to determine what happened." Weinschel, *Corporate Employee Interviews and the Attorney-Client Privilege, supra* at 876. Thus, the control group test inhibits the free flow of information to a legal advisor and defeats the purpose of the attorney-client privilege. *See* 8 Wigmore, Evidence § 2291 (McNaughton rev. 1961). Moreover, the test may result in discouraging communications to lawyers made in a good faith effort to promote compliance with the complex laws governing corporate activity. *See Report of the Committee on Federal Courts of the Association of the Bar of the City of New York,* 43–45, May, 1970, *quoted in* 2 Weinstein's Evidence, ¶ 503[01] (1975) at 503–512 n.1. We conclude that the control group test is inadequate for determining the extent of a corporation's attorney-client privilege.

The *Harper & Row* test provides a more reasoned approach to the problem by focusing upon why an attorney was consulted, rather than with whom the attorney communicated. The test extends the privilege to communications made by any employee if a communication is made at the direction of the employee's superior and concerns the performance of his duties. In contrast to the control group test, it encourages the free flow of information to the corporation's counsel in those situations where it is most needed.

This test also has its critics. They argue, not unjustifiably, that the *Harper & Row* test can shield data from the discovery process. *See, e. g.,* Note, *Privileged Communications—Inroads on the "Control Group" Test in the Corporate Area, supra* at 766. The critics fear that many corpora-

tions will attempt to funnel most corporate communications through their attorneys in order to prevent subsequent disclosure. Judge Jack B. Weinstein, in his text on evidence, suggests several modifications that substantially limit whatever potential for abuse the *Harper & Row* test presents. 2 Weinstein's Evidence ¶ 503(b)[04] (1975).

 We feel that the limitations suggested by Judge Weinstein have merit and that the attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents. We note, moreover, that the corporation has the burden of showing that the communication in issue meets all of the above requirements.

This modified *Harper & Row* test will better protect the purpose underlying the attorney-client privilege. Under this test, the mere receipt of routine reports by the corporation's counsel will not make the communication privileged, either because the communication will have been made available to those who do not need to know or because the communication was not made for the purpose of securing legal advice. Moreover, application of the attorney-client privilege will do little to further encourage this type of communication since they will continue to be made for independent business reasons. By confining the subject matter of the communication to an employee's corporate duties, we remove from the scope of the privilege any communication in which the employee functions merely as a fortuitous witness.[2] These are also communications that ordinarily would be made in any event.

---

**2.** However, the work product rule may apply in such situations. *See* Fed.R.Civ.P. 26(b)(3).

*See also Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

We now apply these standards to the employee interviews to determine whether they are within the scope of the attorney-client privilege. We begin by deciding whether the communications were made for the purpose of securing legal advice for the corporation. We think it clear that they were.

Dean Wigmore has perceptively set forth the following generalized test:

> It is not easy to frame a definite test for distinguishing *legal from nonlegal advice.* * * * [T]he most that can be said by way of generalization is that a matter committed to a professional legal adviser *is prima facie so committed for the sake of the legal advice* which may be more or less desirable for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice.
>
> Obviously, much depends upon the circumstances of individual transactions.

8 Wigmore, Evidence § 2296 (McNaughton rev. 1961) (emphasis included). *See also* Supreme Court Standard 503; McLaughlin, *The Treatment of Attorney-Client Privileges in the Proposed Rules of Evidence for the United States District Courts*, 26 The Record 31 (1971).

Here, the matter was committed to Wilmer, Cutler & Pickering, a professional legal adviser. Thus, it was prima facie committed for the sake of legal advice and was, therefore, within the privilege absent a clear showing to the contrary. No such showing was made. Rather, the December report contained communications which were uniquely legal.

The charge to the professional legal adviser was a broad one. The law firm was given complete autonomy to conduct a professional investigation and inquiry. It was authorized to procure such assistance including accounting services as reasonably required. It was authorized to interview any employee of the corporation who might have knowledge of the facts—from the President to the nonmanagerial employees. Perhaps most importantly, it was given the authority to analyze the accounting data, to evaluate and draw conclusions as to the propriety of past actions and to make recommendations for possible future courses of action. Accountants could have been hired by Diversified to audit the books and records and lay investigators could have been employed to interview employees; but neither would have had the training, skills and background necessary to make the independent analysis and recommendations which the Board felt essential to the future welfare of the corporation.[3] To be sure, there are possibilities of abuse, but the application of the attorney-client privilege to this matter and others like it will encourage corporations to seek out and correct wrongdoing in their own house and to do so with attorneys who are obligated by the Code of Professional Responsibility to conduct the inquiry in an independent and ethical manner. *See Report of the Committee on Federal Courts of the Association of the Bar of the City of New York, supra.*

It is clear that the remaining requirements of the test set forth by Judge Weinstein and adopted by us have been met. The resolution authorizing the law firm to conduct the investigation specifically instructed all corporate employees to cooperate fully with the law firm for purposes of the investigation. An examination of the report reveals that the interviews explored only areas within the bounds of the employees' corporate duties. Finally, the corpora-

---

**3.** We have considered the deposition of Joseph B. Woodlief, the President of Diversified. He stated that he did not believe that Wilmer, Cutler & Pickering represented Diversified "in the context of advice of attorney to client." Woodlief's employment began two months after the law firm was retained. We cannot tell from his deposition whether he thought of attorney-client advice solely in the context of litigation. In any event, his characterization is only one fact to consider in determining whether the communications were privileged. The totality of the circumstances indicates that the communications were privileged.

The fact that the report contains some nonlegal matter does not destroy the privilege since it is insubstantial. *See United States v. United Shoe Machinery Corporation*, 89 F.Supp. 357, 359 (D.Mass.1950).

tion scrupulously avoided disseminating this information to other than those immediately concerned with the results of the investigation.

■ We conclude that these employee interviews are confidential communications of the corporate client and entitled to the attorney-client privilege. Thus, the report and the relevant portions of the corporate minutes and January 30 letter are also privileged because disclosure would reveal directly or inferentially the contents of the interviews.[4] *See Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d 242 at 254 (D.C.Cir.1977); *Schwimmer v. United States,* 232 F.2d 855, 863 (8th Cir.), *cert. denied,* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956); *United States v. International Business Machines Corp.,* 66 F.R.D. 206, 212 (S.D.N.Y.1974); 8 Wigmore, Evidence § 2320 (McNaughton rev. 1961).

■ We finally address the issue of whether Diversified waived its attorney-client privilege with respect to the privileged material by voluntarily surrendering it to the SEC pursuant to an agency subpoena. As Diversified disclosed these documents in a separate and nonpublic SEC investigation, we conclude that only a limited waiver of the privilege occurred. *See Bucks County Bank and Trust Company v. Storck,* 297 F.Supp. 1122 (D.Haw.1969). *Cf. United States v. Goodman,* 289 F.2d 256, 259 (4th Cir.), *vacated on other grounds,* 368

U.S. 14, 82 S.Ct. 127, 7 L.Ed.2d 75 (1961). To hold otherwise may have the effect of thwarting the developing procedure of corporations to employ independent outside counsel to investigate and advise them in order to protect stockholders, potential stockholders and customers.

■ In concluding, we note that the litigants are not foreclosed from obtaining the same information from non-privileged sources. Litigants may still examine business documents, depose corporate employees and interview nonemployees, obtain preexisting documents and financial records not prepared by Diversified for the purpose of communications with the law firm in confidence.[5] *See Colton v. United States,* 306 F.2d 633, 639 (2d Cir. 1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963).

Accordingly, a writ of mandamus will issue compelling the respondent district judge to stay his order of January 6, 1977, with respect to those documents protected by the attorney-client privilege.[6]

The petition for the writ is granted in part and denied in part. Each party shall bear its own costs.

HENLEY, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority of the court that mandamus is a remedy available to

---

**4.** Protection may not be claimed for the remaining portions of the *in camera* material on the basis of the work product rule. These materials were not prepared in anticipation of litigation or for trial. *See* Fed.R.Civ.P. 26(b)(3); *Zenith Radio Corp. v. Radio Corp. of America,* 121 F.Supp. 792, 795 (D.Del.1954); 8 Wright & Miller, Federal Practice and Procedure: Civil § 2024. We note, however, that the client need not be involved in litigation for the attorney-client privilege to attach. *See* Supreme Court Standard 503; 8 Wigmore, Evidence §§ 2294–2295 (McNaughton rev. 1961).

**5.** We need not address at this time the situation where an employee's confidential communications to the corporation's counsel may reveal potential liability of the employee. Ordinarily, the privilege belongs to the corporation and an employee cannot himself claim the attorney-client privilege and prevent disclosure of com-

munications between himself and the corporation's counsel if the corporation has waived the privilege. *In re Grand Jury Proceedings, Detroit, Mich. Aug.,* 434 F.Supp. 648 (E.D.Mich. 1977). However, circumstances may reveal that the employee sought legal advice from the corporation's counsel for himself or that counsel acted as a joint attorney. Under such circumstances, he may have a privilege. *See generally* 8 Wigmore, Evidence § 2312 (McNaughton rev. 1961).

**6.** Subsequent to oral argument, the respondent obtained a copy of the December, 1975, report. They now ask that the petition be dismissed on grounds of mootness. We decline to do so. On remand, the District Court may determine what further action, if any, is appropriate in the light of this Court's holding that the report is privileged.

Diversified in this action, and that the privileges claimed by Diversified, if originally extant, were not waived by the voluntary disclosures made by Diversified to the Securities & Exchange Commission (SEC). I further agree with the majority that the memorandum of June 19, 1975 prepared for Diversified by the law firm of Wilmer, Cutler & Pickering (Law Firm) is not privileged, and that certain corporate minutes of Diversified are not privileged, except perhaps to the extent that they may disclose otherwise protected matter.

To the extent that the court holds that Law Firm's report to Diversified's Board of Directors, dated December 5, 1975, or any other material related to that report is privileged from disclosure on the basis of the traditional attorney-client privilege, I respectfully dissent.[1] In so doing I lay to one side what is to me the very serious question of whether or not this entire controversy has become moot due to the disclosures that have now been made by SEC by virtue of which Weatherhead and its attorneys have been able to obtain all of the information that they sought originally.[2]

In *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950), a frequently cited case, Judge Wyzanski stated the conditions under which the attorney-client privilege is applicable. He said (89 F.Supp. at 358–59):

. . . The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in

some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

A somewhat shorter definition of the privilege, cited with approval in 8 Wright & Miller, Federal Practice & Procedure, § 2017, p. 133, is to be found in *Wonneman v. Stratford Securities Co.*, 23 F.R.D. 281, 285 (S.D.N.Y.1959): ". . . where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal advisor except the protection be waived."

While the attorney-client privilege, where it exists, is absolute, the adverse effect of its application on the disclosure of truth is potentially such that the privilege should be construed strictly. See *Radiant Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314, 323 (7th Cir. 1963); *Underwater Storage, Inc. v. United States Rubber Co.*, 314 F.Supp. 546, 547–48 (D.D.C.1970); *United States v. United Shoe Machinery Corp., supra*, 89 F.Supp. at 358.

In order for the privilege to come into play, it must appear that the relationship of the parties to the communication sought to be protected was that of attorney and client. It must also appear that the attorney was engaged or consulted by the client for the purpose of obtaining legal services or advice that a lawyer may perform or give in his capacity as a lawyer, not in some other capacity. A communication is not privileged simply because one of the parties to it is a lawyer. 8 Wright & Miller, *op. cit.*, p. 136. See *Underwater Storage, Inc. v. United States Rubber Co., supra; In re Natta*, 264 F.Supp. 734, 741 (D.Del.1967), aff'd on other issues, 388 F.2d 215 (3d Cir. 1968); *Georgia-Pacific Plywood Co. v. Unit-*

---

1. As will be seen, I do not consider that the attorney-client privilege is available to Diversified in this case. Nor do I consider that the material in question is protected "work product" under Fed.R.Civ.P. 26(b)(3), which codifies the rule laid down in the leading case of

*Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

2. Had the court been willing to dismiss this appeal on the ground of mootness, I would have concurred gladly.

*ed States Plywood Corp.*, 18 F.R.D. 463, 464 (S.D.N.Y.1956); *Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792, 794 (D.Del.1954).

Where an attorney-client relationship in fact exists and where the client is a corporation, a question may arise as to how far down the corporate table of organization the privilege extends. Is the privilege limited to corporate personnel who may be said to be in the corporation's "control group", as many of the cases seem to have held? Or is the privilege the broader one defined in *Harper & Row Publishers, Inc. v. Decker*, 423 F.2d 487 (7th Cir. 1970), *aff'd by an equally divided court*, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971)?

Much of the discussion that appears in the opinion of the majority in this case is devoted to the question mentioned in the preceding paragraph, and it is only after the majority adopts the *Harper & Row* test, as modified to some extent by Judge Weinstein, that the majority turns to a consideration of the underlying questions of whether Diversified was Law Firm's client and whether Law Firm was employed to perform legal services or to give legal advice.

If I were able to accept the majority's premise that Diversified employed Law Firm as its attorney to give it legal advice or to perform legal services, I would not, at least to a point, have any trouble with the adoption of a modified *Harper & Row* test to be applied in identifying corporate personnel whose communications would be considered as falling within the attorney-client privilege, although I might have some trouble in including within the privileged category communications involving officers or employees of corporations that are subsidiaries of or affiliated with the corporate client or involving corporate personnel who have dealt adversely to the corporate client.[3]

My point of departure from the majority is that I cannot accept its premise.

The majority having defined what it deems to be the applicable standards in *Harper & Row-Weinstein* terms undertakes to apply those standards "to the employee interviews to determine whether they are within the scope of the attorney-client privilege." And the majority first addresses itself to the question of whether "the communications were made for the purpose of securing legal advice for the corporation." Having answered that question in the affirmative, the majority determines that "the remaining requirements of the test set forth by Judge Weinstein and adopted by us have been met," and the final conclusion of the majority is that the December, 1975 report of Law Firm, the "relevant portions of the corporate minutes," and the January 30, 1976 letter of Diversified's president are all covered by the attorney-client privilege. I cannot agree.

In answering the question of the purpose for which the communications were made the court refers to certain language appearing in 8 Wigmore on Evidence, § 2296, pp. 566–67 (McNaughton rev. 1961). I think that the quotation should be expanded to some extent so as to include all of the language that appears in § 2296 on pp. 566–67.

§ 2296. Advice sought for sundry nonlegal purposes; Consultation with prosecuting attorneys. A lawyer is sometimes employed without reference to his knowledge and discretion in the law—as where he is charged with finding a profitable investment for trust funds. So, too, one not a lawyer is sometimes asked for legal advice—as where a policeman or a clerk of court is consulted. It is not easy to frame a definite test for distinguishing *legal from nonlegal advice.* Where the general purpose concerns legal rights and

3. In this case Law Firm's investigations, which were assisted by the accounting firm of Arthur Andersen & Co., which reported to Law Firm, were not limited to officers, employees and records of Diversified itself. The investigation involved in some measure the personnel and records of subsidiary or affiliated corporations, and there is reason to believe that in at least one instance a substantial sum of money turned over by Diversified to the president of a subsidiary corporation for a particular purpose, perhaps unlawful, was not used for that purpose but was diverted to the private pockets of the two individuals involved in the transaction.

obligations, a particular incidental transaction would receive protection, though in itself it were merely commercial in nature [footnote omitted]—as where the financial condition of a shareholder is discussed in the course of a proceeding to enforce a claim against a corporation. But apart from such cases, the most that can be said by way of generalization is that a matter committed to a professional legal adviser *is prima facie so committed for the sake of the legal advice* which may be more or less desirable for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice.

Obviously, much depends upon the circumstances of individual transactions.

With regard to that language, I think that it is going too far to say that every time a matter is entrusted to a lawyer communications developed in the course of the entrustment are prima facie privileged, and that the burden is on the party seeking disclosure of the communications to make it "clearly appear" that the entrustment is "lacking aspects requiring legal advice." And I doubt that Dean Wigmore intended to go so far. The difficulty is that, at least in many instances, the party seeking disclosure does not know in advance and has no way of knowing why the matter in question was turned over to the lawyer, or why the communications were developed, or what they amounted to or contained. Thus, apart from in camera proceedings, such as the one that was had in this case, there is no way for the party seeking disclosure to meet the prima facie case of privilege mentioned by Wigmore.

However, my dissent is not based upon any question of the incidence of burden of proof in the area of attorney-client privilege or on any question of whether Weatherhead made any evidentiary showing that it may have been required to make.

I have given careful consideration to the material that Judge Meredith considered in camera, and particularly to the documents that reflected the employment of Law Firm

and the December, 1975 report that Law Firm submitted to Diversified's Board of Directors. From that consideration I am satisfied that Law Firm was not employed to provide legal services or advice. It was employed to make a factual investigation and business recommendations in such areas as the results of the investigation might suggest. And Law Firm did just that. The work that Law Firm was employed to perform and the work that it performed could have been performed just as readily by non-lawyers, aided to the extent necessary by a firm of public accountants, just as Law Firm was assisted by Arthur Andersen & Co. Thus, one of the primary requisites of a successful claim of attorney-client privilege never came into existence.

The majority takes note of the fact that Joseph B. Woodlief, who became president of Diversified two months after Law Firm was employed, testified by deposition that he did not believe that Law Firm "represented Diversified 'in the context of advice of attorney to client.'" As to that testimony, the majority after observing the date of Woodlief's employment in relation to the date of the employment of Law Firm goes on to say: "We cannot tell from his deposition whether he thought of attorney-client advice solely in the context of litigation. In any event, his characterization is only one fact to consider in determining whether the communications were privileged. The totality of the circumstances indicates that the communications were privileged." And the majority also observes that the fact that the report contains some nonlegal matter does not destroy the privilege because in the majority's eyes the nonlegal matter is "insubstantial."

If Mr. Woodlief misconceived the connection between Diversified and Law Firm, then his misconception was shared by the corporation's Board of Directors and, perhaps more importantly, by Law Firm itself.

The minutes of the Board which relate to the employment of Law Firm indicate that the Firm was hired as an investigator and not as legal counsel. The fact that the Firm is referred to as "Special Counsel" and

the fact that it doubtless had some expertise in SEC practice do not in and of themselves create any attorney-client relationship.

In its original memorandum which was prepared in June, 1975 and which all of the members of the court agree contained no privileged matter, Law Firm clearly warned Diversified that communications made and data assembled in the process of the proposed investigation might well be the subject of enforced disclosure.

The critical document involved in the case is the December, 1975 report to the Board which is a succinct and well written document. Since the majority holds that the report is privileged and is unwilling to dispose of the case on the ground of mootness of controversy notwithstanding the fact that Weatherhead and its lawyers have now obtained a copy of the report, I am somewhat handicapped in discussing the report and its contents.

The report consists of a factual statement of the historical background of Law Firm's investigation, a description of the investigation, factual findings, a discussion of certain limitations upon the investigation, accounting recommendations made by Arthur Andersen & Co., and certain recommendations made by Law Firm itself. Affixed to the report are certain items of documentary material.

In the introductory portion of the report Law Firm explains that the report is based on the joint efforts of Law Firm and Arthur Andersen & Co., that much documentary material had been examined, that a number of identified persons had been interviewed, and that a number of identified persons had not been interviewed.

Law Firm made findings with respect to the question of whether cash funds had in fact been surreptitiously created and used in violation of Diversified's established business procedures and internal controls. Some transactions involving substantial sums of money Law Firm found itself unable to explain. One isolated transaction which does not appear to involve either "slush funds" or Weatherhead is described.

The report recites that the over-all investigation was hampered to some extent by the fact that some individuals refused to be interviewed and that other individuals were not available.

One of the attachments to the report consists of the accounting recommendations of Arthur Andersen & Co. I see nothing in those recommendations that would constitute "legal advice." There was one specific statement of Arthur Andersen & Co. which Law Firm deemed it well to stress. That statement, introductory in nature, was as follows:

> . . . At the outset . . . we wish to emphasize that the institution of these [recommended] procedures will be meaningless if the personnel who have responsibility for their implementation are not faithful in the performance of their duties. There is no system of internal control that can presently be devised which cannot be circumvented if the responsible persons conspire to do so.

That statement is but an expression of the obvious. A business man certainly does not need a lawyer to tell him that the internal controls that he has established with respect to his business operations are valueless if they are intentionally violated or ignored by those whose duty it is to administer them.

Law Firm made three recommendations of its own which may be summarized as follows: (1) That the accounting procedures recommended by Arthur Andersen & Co. be adopted; (2) that the Board make such changes in personnel as it deemed necessary in the light of the report to prevent a recurrence of certain practices; and (3) that the Board should consider whether appropriate steps should be taken to restore allegedly misused assets.

Those recommendations could have been made by any firm of private investigators, or by accountants, or by bankers, or, for that matter, by any person possessing ordinary common sense and business prudence. And I do not consider that the making of the investigation or the making of the rec-

ommendations based thereon amounted to the performance of legal services or the giving of legal advice.

Finally, it appears to me that if Law Firm had felt that it had been employed as legal counsel and that the information that it had collected was privileged, it would hardly have concluded its report by referring to what Law Firm had always felt was a serious disclosure problem and suggesting that Diversified consult its regular counsel in that connection.

This opinion may be too long. I hope that it does not appear to be too critical or quarrelsome. In another factual setting I would have no trouble agreeing with much of what is said by way of principle in the opinion of the court. As it is, I am of the view that the majority's holding on the issue of attorney-client privilege simply is not geared to the facts of the instant case. I would dismiss the petition in its entirety.

GIBSON, Chief Judge, concurring in part and dissenting in part.

The majority opinion describes the controversy that exists as to what communications, by which corporate agents, are protected by the attorney-client privilege. I am pleased to concur in Judge Heaney's analysis and in the granting of the writ insofar as it relates to the reports from Wilmer, Cutler in December 1975. I also agree that the June report is unprotected.

The separate problems involved in holding corporate minutes to be protected have received little attention in reported decisions. *See generally*, Burnham, *The Attorney-Client Privilege in the Corporate Arena*, 24 Bus.Law. 901 (1969). In the present case the briefs of the parties do not address discoverability of the minutes as a separate issue. After carefully considering the nature of corporate minutes and the policies justifying the attorney-client privilege, I have concluded that I must dissent from the granting of the writ to protect the minutes of Diversified.

This privilege, as with all privileges, should be confined to the narrowest limits compatible with the purpose of and the justification for the privilege. The corporate minutes in this case are not communications to the law firm. They can be considered privileged only as memorializations of the report which contained protected material. However, corporations are required to keep minutes by statute. *See, e. g.* § 351.215 Mo.Rev.Stat.1969. Minutes are available for inspection by shareholders under penalty of monetary sanctions. *See, e. g.*, § 351.215 Mo.Rev.Stat.1969; *State ex rel. Aimonette v. C. & R. Heating & Service Co.*, 475 S.W.2d 409 (Mo.App.1971). This shareholder right is occasionally limited; for example, Alabama restricts the right to examination "for any proper purpose." *Garner v. Wolfinbarger*, 430 F.2d 1093, 1104 n.21 (5th Cir. 1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971). Surely few would question the propriety of a shareholder's investigating whether the corporation or its agents have engaged in unlawful conduct. Therefore I conclude that if the plaintiff in this action were a shareholder of Diversified, he would be entitled to discover the minutes. *See* 5 W. Fletcher, *Cyclopedia of Private Corporations* § 2240 (rev. 1976).

If confidentiality of these communications is to be maintained, there are procedures available for doing so without disclosing them on the corporate minutes. Because corporate minutes are open to shareholder inspection, in my view publication therein of parts of the December report constituted a waiver of the privilege. Continued confidentiality is a predicate for operation of the privilege. That predicate is missing in this case.

At least one commentator has criticized *Garner, supra*, because the rationale of that case emphasized the identity of the opposing party in determining the extent of the privilege. He stated:

Since the availability of the privilege primarily turns on the nature and attributes of the adversary party, the corporation is deprived of any advance certainty that the communication will later be protected. Without the predictive certainty needed to induce disclosure by the client,

the privilege is effectively vitiated; none of the benefits flowing from disclosure will be realized, and counsel will be made less effective.

Note, *The Attorney-Client Privilege and the Corporation in Shareholder Litigation*, 50 So.Cal.L.Rev. 303, 322 (1977). This limitation on the practical utility of the privilege when applied to corporate minutes strengthens my conviction that the corporate minutes in this case are not privileged.

I do not mean that third parties have discovery rights identical with stockholders. It might be appropriate to require disclosure of other records or information to stockholders that would be privileged vis-a-vis third parties. However, in light of the statutory requirement that minutes be kept and the common law and statutory right of shareholder examination, I feel the minutes cannot be considered privileged.

BRIGHT, Circuit Judge, dissenting:

As noted in my brother Henley's dissent, Weatherhead, the plaintiff in the underlying action against Diversified, now advises us it (Weatherhead) has obtained the information here. in question from Diversified's reports filed with the SEC. This change in circumstances in the litigation, in my opinion, moots this controversy and renders improper any issuance of a writ of mandamus to Chief District Judge Meredith, the respondent herein.

Although reluctant to express an opinion on the merits because of my view that the controversy is moot, I agree in the main with the dissenting views of Judge Henley.